STATE OF NORTH CAROLINA v. JOHN HENRY THOMPSON

No. 142A03

(Filed 3 December 2004)

**1. Jury— selection—examination after peremptory challenge—replacement not yet called**

There was no apparent prejudice from an alleged violation of N.C.G.S. § 15A-1214(a) when a prosecutor in a capital first-degree murder trial examined the remaining jurors after a peremptory challenge without first calling a replacement juror.

**2. Jury— selection—examination after peremptory challenge—no structural error**

A violation of the random selection provision of N.C.G.S. § 15A-1214(a) during jury selection (examination of the remaining jurors after a peremptory challenge without seating a replacement) was not structural error. A technical violation of a statute is not sufficient to support a claim of a defect in the trial mechanism so serious that the trial cannot reliably determine guilt or innocence.

**3. Sentencing— capital—victim impact statement—family's refusal to speak**

A clinical social worker's testimony in a capital sentencing proceeding that the victim's family was not willing to talk with her about defendant's remorse and willingness to accept a life sentence was not an impermissible victim impact statement. The family had never spoken with the witness, her testimony did not present their opinions and characterizations about the crime and defendant, and the evidence was not admitted through a family member or formal victim impact statement.

**4. Sentencing— capital—mitigating circumstances—defendant's willingness to plea bargain—not submitted**

The trial court did not err in a capital sentencing proceeding by refusing to submit the nonstatutory mitigating circumstance that defendant was willing to plead guilty and accept a life sentence. There is no definitive evidence in the record that the State offered or that defendant would have accepted a plea for a lesser sentence and any willingness to accept the plea may have indicated only defendant's willingness to lessen his exposure to the death penalty. Defendant chose to proceed to trial and cannot

now complain that he should have been allowed to reveal his hypothetical willingness to enter a guilty plea.

**5. Sentencing— capital—mitigating circumstances—no significant criminal history—not submitted**

The trial court did not err in a capital sentencing proceeding by not submitting ex mero motu the mitigating circumstance of no significant criminal history. No rational jury could have concluded that defendant had no significant history of prior criminal activity based on evidence that defendant had prior felony convictions for five second-degree kidnappings and two armed robberies with similarities between those cases and this case. Additionally, the jury found seven aggravating circumstances based on the prior convictions.

**6. Sentencing— capital—mitigating circumstances—defendant's age—not submitted**

The trial court did not err in a capital sentencing proceeding by not submitting ex mero motu the mitigating circumstance of defendant's age at the time of the crime. There was evidence that defendant functioned emotionally as an adult that counterbalanced the defense testimony; moreover, the jury did not find the submitted circumstance that "defendant functions emotionally at the age of an adolescent."

**7. Sentencing— capital—mitigating circumstances—nonstatutory—peremptory instruction—rejection of unchallenged evidence**

The trial court did not err in a capital sentencing proceeding by giving peremptory instructions that permitted the jury to reject a nonstatutory mitigating circumstance by finding that it did not exist even when the trial court found that all the evidence tended to show its existence.

**8. Sentencing— capital—mitigating circumstances—nonstatutory—peremptory instruction—rejection of unchallenged evidence**

The trial court did not err in a capital sentencing proceeding by giving peremptory instructions that permitted the jury to reject a nonstatutory mitigating circumstance by finding that it did not exist even when the trial court found that all the evidence tended to show its existence.

**STATE v. THOMPSON**

[359 N.C. 77 (2004)]

**9. Appeal and Error— cumulative error—no underlying error**

There was no need to consider defendant's cumulative error argument regarding jury instructions and mitigating circumstances where there was no error on those issues.

**10. Sentencing— capital—aggravating circumstances—prior violent felonies—armed robberies**

There was no error in a capital sentencing proceeding where defendant argued that the aggravating circumstances that he had previously been convicted of a felony involving violence against each of two people was not supported by the evidence. Although defendant argued that the indictments for those two felonies listed the name of a restaurant as the victim and that the evidence showed that the restaurant was the entity that was robbed, with the two individuals merely being present, both the aggravating circumstances submitted to the jury and the evidence at trial conveyed to the jury that the two employees were present and endangered or threatened during the robberies, which is the gravamen of the offense. Furthermore, it is clear from the indictments and other evidence that the property taken did not belong to defendant. Any inconsistency between the aggravating circumstance, the indictment, and the trial testimony was immaterial.

**11. Robbery— indictment—victim capable of owning property—not a required element—larceny distinguished**

The trial court did not err by not dismissing an indictment for robbery with a dangerous weapon because the indictment did not include the element that the victim, Domino's Pizza, was a legal entity capable of owning property. While an indictment for larceny must allege that an entity listed as the victim be capable of owning property, armed robbery is a separate and distinct crime and an armed robbery indictment is not fatally defective simply because it does not correctly identify the owner of the property taken. The property description here was sufficient to demonstrate that the property did not belong to defendant.

**12. Sentencing— capital—prosecutor's argument—defendant's decisions**

The prosecutor in a capital sentencing proceeding did not engage in an improper argument by referring to decisions defendant made on the day of the murder and arguing that those decisions led to the present proceeding and the jury's decision. There was no indication that the prosecutor expressly or implicitly

argued that life imprisonment should not be considered, that the jury should disregard defendant's pleas for mercy, or that defendant's sentence was determined automatically and was not the jury's decision.

### 13. Sentencing— capital—prosecutor's argument—factors

The prosecutor in a capital sentencing proceeding did not make an improper closing argument by referring to "factors" which would help the jury making its decision. The use of "factors" did not refer to additional aggravating circumstances, but to facts the jury could consider when weighing both aggravating and mitigating circumstances. The prosecution meticulously explained the statutory aggravating circumstances submitted to the jury, the trial court instructed the jury only on those circumstances, and it is presumed that the jury followed the instructions.

### 14. Constitutional Law— capital sentencing—defendant's right to be present throughout—bailiff's contact with jury

Defendant was not entitled to a new capital sentencing proceeding because he and his attorney were excluded from alleged unrecorded exchanges between the bailiff and the jury. The court ordered the jury brought in at the end of the day so that he could release them, the bailiff conferred with the court, proceedings continued, and a verdict was announced shortly thereafter. Defendant had the right to be present at all stages of his trial, but error will not be assumed where it does not appear in the record.

### 15. Constitutional Law— effective assistance of counsel—concession of guilt

A first-degree murder defendant's representation was constitutionally sufficient in his concessions of guilt. In context, counsel's statements during voir dire were part of a broader series of questions aimed at whether prospective jurors were predisposed to vote automatically for or against the death penalty and were not intended as concessions of guilt. Defendant voluntarily and knowingly consented on the record to counsel's argument during the guilt phase.

### 16. Constitutional Law— effective assistance of counsel—identity of claims—motion for appropriate relief

Defendant's request that the Supreme Court identify a list of potential ineffective assistance of counsel claims not subject to

the statutory procedural bar for motions for appropriate relief was denied because of the sheer number and breadth of defendant's potential claims, his failure to provide an argument as to why the record was insufficient to raise those claims currently, and the fact that he refers to a cumulative ineffective assistance of counsel claim. However, the relief sought by defendant is not a request for an advisory opinion and is not entirely without precedent. Moreover, defendant's attempt to raise this issue on direct appeal does not preclude raising his claims in a future proceeding.

## 17. Sentencing— death penalty—not disproportionate

A sentence of death was not disproportionate where defendant murdered the manager of his former place of employment during an armed robbery; he shot his victim in the face with a sawed-off shotgun, manually reloaded the shotgun, cocked the hammer, and pulled the trigger, causing a second fatal wound; defendant set fire to the building in an apparent attempt to cover up his crimes; defendant's criminal history includes seven violent felonies committed during two robberies factually similar to this case; the jury found seven aggravating circumstances based upon those felonies; this case is more analogous to cases in which the death penalty has been found proportionate than to those in which it has been found disproportionate; and the death penalty was neither excessive nor disproportionate considering the nature of the crime and the defendant.

Justice NEWBY did not participate in the consideration of decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Peter M. McHugh on 14 November 2002 in Superior Court, Guilford County, upon a jury verdict finding defendant guilty of first-degree murder. On 5 September 2003, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 10 May 2004.

*Roy Cooper, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Janet Moore, Assistant Appellate Defender, for defendant-appellant.*

STATE v. THOMPSON

[359 N.C. 77 (2004)]

BRADY, Justice.

Kenneth Bruhmuller was murdered at his workplace on 31 March 2001. On 16 April 2001, a Guilford County grand jury indicted defendant John Henry Thompson for the first-degree murder of Bruhmuller, burning of a building used for trade, and robbery with a dangerous weapon. On 5 August 2002, another Guilford County grand jury returned a superseding indictment against defendant for burning of a building used for trade. Defendant was tried capitally before a jury at the 4 November 2002 Regular Criminal Session of the Superior Court, Guilford County. On 8 November 2002, the jury returned a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of robbery with a firearm and burning of a building used in trade. On 14 November 2002, following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court sentenced defendant to a term of 103 months minimum and 133 months maximum imprisonment for the robbery conviction and a consecutive term of 21 months minimum and 26 months maximum imprisonment for the burning of a building offense.

Defendant appealed his sentence of death to this Court as of right pursuant to N.C.G.S. § 7A-27(a). On 5 September 2003, this Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of the noncapital convictions and judgments.

This Court heard oral argument in defendant's case on 10 May 2004. After consideration of the assignments of error raised by defendant on appeal and a thorough review of the transcript, the record on appeal, the briefs, and oral arguments, we find no error meriting reversal of defendant's first-degree murder conviction or death sentence.

Evidence presented by the State at trial, including video surveillance, indicated that on Saturday, 31 March 2001, defendant entered Domino's Pizza on South Chapman Street in Greensboro, North Carolina, shortly before the business was to open at 11:00 a.m. Defendant ordered five large pizzas from Kenneth Bruhmuller, the manager and only employee present. Defendant was a former assistant manager at that same Domino's and knew Bruhmuller. The order was placed in defendant's first name, "John," and defendant was charged a discounted price. Bruhmuller and defendant then exited the store.

Domino's area supervisor, Will Spivey, testified that it was the common practice of Domino's employees to wash their vehicles at the rear entrance of the building. Spivey also testified that managers usually parked their cars in the alleyway leading to the rear of the building. After defendant and Bruhmuller went outside, Bruhmuller moved his car, which was blocking the alleyway, and defendant backed his car down the alleyway toward the rear of the building. A short time later, defendant was recorded by video surveillance reentering the building, but he soon walked out of view of the lobby area video camera. Several minutes passed before the lobby area camera showed defendant's car pulling out of the alleyway, after which time the building began to fill with smoke. It was later determined that approximately $195.00 was missing from a cash drawer in the business' office area.

When other employees arrived around 11:15 a.m., the building was filled with smoke, and flames were rising out of a broken window. The employees opened the front doors, crawled a few feet into the building, and yelled Bruhmuller's name, but received no response. Greensboro Fire Department personnel responded at the scene shortly thereafter and discovered Bruhmuller's body on the floor in the office area. Fire Department Captain Gary Church testified that Bruhmuller appeared to have "a fatal wound . . . from a gunshot" or "a wound to the head, from some type of explosion." Captain David L. Leonard, the arson investigator, believed that the fire originated in the break/storage room area due to the ignition of "readily available material," on a couch and, after ruling out other causes, concluded that it could only have been started by "human intervention."

Spivey and assistant manager Kenneth Leland Smith identified defendant as the suspect in the surveillance video taken from inside the store on the day of the fire. Defendant was subsequently arrested and transported to the Greensboro Police Department for an interview.

A pat down search incidental to defendant's arrest revealed that he was carrying Bruhmuller's driver's license and social security card. In a subsequent search, police discovered a knife in defendant's front right pocket and a spent, twenty-gauge shotgun shell casing in his front left pocket.

Defendant signed a consent form allowing police to search his vehicle. In the trunk, police discovered a sawed-off twenty-gauge Model 37 Winchester shotgun, a short sword, a bayonet with a cover,

and a black ski mask. On the floorboard of the car's interior, police located a piece of crumpled up white paper that matched printer paper used to label pizza boxes found at the scene of the crime. Police also found a bag containing seventeen loose twenty-gauge shotgun shells and an empty, twenty-five-count box of shotgun shells.

After being advised of his *Miranda* rights and signing a waiver of rights form, defendant gave a statement to Greensboro Police Department Detective Norman Rankin. Defendant said, "I'm sorry Saturday ever happened." He began crying and said, "That was stupid." He further stated that his bills were "piling up" and that he could not get a job. Defendant continued, saying "[i]t was an accident. Going to Domino's was the accident. I went there just to get the money. I planned this when I drove by the store."

Defendant later told Detective Rankin that he took $200.00 from a drawer in the office, as well as Bruhmuller's wallet, which contained an additional $20.00 to $25.00. Regarding the killing of Bruhmuller, defendant said that "[i]t's like the gun fired by itself, 'cause, I swear, I don't remember pulling the trigger." Defendant identified the weapon as a twenty-gauge shotgun that had been "sawed off." Defendant said that he left the building after it caught on fire, but did not recall setting the fire. According to defendant, he later threw Bruhmuller's wallet away but kept his driver's license and social security card. During the interview Detective Rankin wrote what defendant told him verbatim, and defendant then read and signed the written statement. Responding to specific questions posed by Detective Rankin, defendant admitted to robbing Domino's of $200.00 because he needed money to pay bills, although he denied that the robbery was planned. He admitted to using a shotgun, but stated that the shooting of "Ken" was accidental, and again denied setting the fire.

North Carolina Chief Medical Examiner John D. Butts, M.D. testified concerning the autopsy he performed on Bruhmuller's body. The autopsy revealed two shotgun entry wounds to Bruhmuller's facial region, one in the central part of the face and the other in the chin and mouth area. Dr. Butts concluded that the wounds were inflicted from a distance that "was close, but not very, very close. . . . consistent with a distance of several feet." Dr. Butts testified to his opinion that Bruhmuller died as a result of the gunshot wounds, either of which would have been instantaneously fatal. According to Dr. Butts,

Bruhmuller's air passages were not sooty, an indication that he had not inhaled smoke, and the level of carbon monoxide in his blood was inconsistent with someone who had inhaled "combustion product gases" from a fire.

Special Agent David Santora of the North Carolina State Bureau of Investigation was qualified at trial as an expert in firearm and toolmark identification. Santora testified that he determined the spent shotgun shell casing found in defendant's pocket was fired from the shotgun found in defendant's car. Santora also testified that pellets recovered from a pool of blood in the Domino's office and pellets recovered from Bruhmuller's head during the autopsy were derived from a gauge of shotgun shell that was "most consistent in size and weight" with the gauge of the unspent shells found in defendant's car. Santora explained that the firearm found in defendant's car was a single-action shotgun that holds only one shell at a time. Agent Santora testified that to load this shotgun, "One would insert a live shotgun shell into the barrel, and it would stop, so it was flush with the end. Close the gun. It would lock up. (Demonstrated.) And then the hammer would be manually cocked, and the trigger would be pulled. (Demonstrated.) And that would fire the shotgun shell." According to Santora, the firearm would have to be reloaded, the hammer cocked, and the trigger pulled between every shot.

During defendant's capital sentencing proceeding, forensic psychologist Dr. James H. Hilkey testified on defendant's behalf. According to Dr. Hilkey's testimony and written evaluation, defendant informed the doctor that on the morning of the crime, he had consumed alcohol and had smoked marijuana. Defendant stated that he drove to a local car wash, but because it was crowded, he decided to wash his car at Domino's. Defendant said that when he opened his trunk, he saw the shotgun and decided to use it to take enough money to satisfy his bills. He stated that he did not intend to kill Bruhmuller and that the first shot was an accident. When asked about the second shot, defendant said, tearfully, that he knew the first wound was fatal and did not want Bruhmuller to suffer. Dr. Hilkey testified to his opinion that defendant "fits clearly the diagnosis for both alcohol and substance abuse" and, at the time of the killing, defendant "was operating under the influence of a mental or emotional disturbance."

Additional relevant facts will be presented when necessary to resolve specific assignments of error raised by defendant.

### JURY SELECTION

**[1]** Defendant assigns statutory and structural error to the method of jury selection implemented at trial. In particular, defendant argues that the trial court violated the random selection provision of N.C.G.S. § 15A-1214(a) by allowing prosecutors to examine remaining jurors following the exercise of a peremptory challenge without first calling a replacement juror to the jury box.

The transcript shows that late in the afternoon on 4 November 2002, the State conducted *voir dire* of the final four prospective jurors remaining in the current jury panel. Upon the State's challenge of two jurors for cause, the trial court inquired of the prosecutor, "[D]o you have any objection to proceeding with questions to the remaining two members of the panel, although it would not constitute a full panel?" The prosecutor responded that he did not object. Then the trial court turned to defense counsel asking, "Is there any objection by the defense to continuing examination of the two jurors in the box?" Defense counsel responded, shaking his head from side to side to indicate that he did not object. Thereafter, the prosecutor continued *voir dire* of the two remaining prospective jurors. The State subsequently exercised peremptory challenges as to these two jurors.

Generally, a defendant who assigns error to a violation of N.C.G.S. § 15A-1214 must show that he was prejudiced by that statutory violation before he is entitled to relief. *State v. Garcia*, 358 N.C. 382, 406, 597 S.E.2d 724, 743 (2004); *State v. Jaynes*, 353 N.C. 534, 545, 549 S.E.2d 179, 190 (2001), *cert. denied*, 535 U.S. 934, 152 L. Ed. 2d 220 (2002); *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). Here, defendant has made no attempt, either in written brief or at oral argument before this Court, to show how the alleged statutory violation prejudiced his defense. Prejudice is not readily apparent from the record before the Court; therefore, defendant's assignment of statutory error is overruled.

**[2]** Defendant also argues that the alleged statutory violation amounted to structural error. "Structural error is a rare form of constitutional error resulting from 'structural defects in the constitution of the trial mechanism' which are so serious that 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.'" *State v. Garcia*, 358 N.C. at 409, 597 S.E.2d at 744 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 113 L. Ed. 2d 302, 331 (1991) and *Rose v. Clark*, 478 U.S. 570, 577-78, 92 L. Ed. 2d

460, 470 (1986)). As we have previously stated, a mere technical violation of N.C.G.S. § 15A-1214 is insufficient to support a claim of structural error. *Garcia*, 358 N.C. at 410, 597 S.E.2d at 745. Defendant does not argue that the alleged statutory violation was so serious as to render his trial unreliable as a determination of guilt or innocence, nor does defendant argue that his case is similar to the six cases of structural error that the United States Supreme Court has identified to date. *See Johnson v. United States*, 520 U.S. 461, 468-69, 137 L. Ed. 2d 718, 728 (1997) (listing six cases in which the United States Supreme Court has found structural error and citing: *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799 (1963) (complete deprivation of the right to counsel); *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182 (1993) (constitutionally deficient jury instructions on reasonable doubt); *Vasquez v. Hillery*, 474 U.S. 254, 88 L. Ed. 2d 598 (1986) (unlawful exclusion of grand jurors of the defendant's race); *McKaskle v. Wiggins*, 465 U.S. 168, 79 L. Ed. 2d 122 (1984) (denial of the defendant's right to self-representation); *Waller v. Georgia*, 467 U.S. 39, 81 L. Ed. 2d 31 (1984) (denial of the right to a public trial); and *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749 (1927) (biased trial judge)). Accordingly, this assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[3] Defendant next assigns prejudicial error and, in the alternative, plain error to the prosecutor's elicitation of victim-impact evidence during defendant's capital sentencing proceeding. Specifically, defendant asserts that the prosecutor's cross-examination of social worker Deborah Taylor Grey improperly elicited evidence that the victim's family, the Alexanders, wanted the jury to recommend a sentence of death for defendant. Defendant argues that the prosecutor's elicitation of this evidence was deliberate and that the prosecutor thus violated the Eighth Amendment prohibition against cruel and unusual punishment by presenting evidence as to family members' characterization and opinion about the crime, the defendant, or the appropriate sentence. *South Carolina v. Gathers*, 490 U.S. 805, 104 L. Ed. 2d 876 (1989), *overruled in part by Payne*, 501 U.S. 808, 115 L. Ed. 2d 720; *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440 (1987), *overruled in part by Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720 (1991).

Defendant acknowledges that *Booth v. Maryland* and *South Carolina v. Gathers*, the two cases upon which he relies, were overruled in part by *Payne v. Tennessee*. Defendant argues, however, that

the type of victim-impact evidence admitted at the sentencing phase of his trial, which concerned the family's opinion as to the appropriate sentence, was not addressed by *Payne*. According to defendant, the admission of such evidence is still prohibited by *Booth* and *Gathers*; thus, the admission of Grey's testimony here was prejudicial error or, in the alternative, plain error for which defendant must receive a new sentencing hearing.

During the capital sentencing phase of defendant's trial, defendant called Deborah Taylor Grey, a licensed clinical social worker. Grey prepared a psychosocial history of defendant, including information on his family, education, employment, and relationship background, and testified to her findings on direct examination. On cross-examination, the prosecutor elicited the following testimony from Grey:

Q [THE PROSECUTOR] During the course of this thorough background check that you did, did you have an occasion to do any background at all on the victim or his family?

A [GREY] I did not have a chance to do background interviews, as far as the victim or his family.

Q Why not?

A I had contacted actually the Bruhmullers—or the Andrews (sic) family, and asked if they would be willing to talk with me, and they were not.

Q And why did you contact them?

A I contacted them for two reasons. One reason was to be able to talk to them. The other reason was because Mr. Thompson had expressed a considerable degree of remorse and a willingness to take a sentence of life imprisonment. And I contacted them, to see if they would be open to discussing that.

Q Had you seen the pictures of what Mr. Thompson had done to their son?

A No, I had not.

Q Based on what you know about it, is it understandable to you why they might not want to talk to you?

A  Yes, it was.

Grey went on to testify that she contacted Bruhmuller's biological father, who had been estranged from his son "[f]or a considerable period of time."

On redirect examination, defendant's attorney elicited testimony from Grey that the victim's biological father "would be satisfied with Mr. Thompson serving a life sentence . . . . [w]ithout the possibility of parole." On recross examination, Grey testified as follows:

Q  [THE PROSECUTOR] Do you know when [was] the last time Kenneth Bruhmuller's father saw him?

A  [GREY] I do not. I know from what he said to me that it had been many years.

Q  And do you know that this gentleman back here [referring to the victim's stepfather] is actually the one that raised him as a son?

A  I do.

Q  Have you asked this gentleman back here what his opinion was?

A  Well, I wrote the Andrews (sic) a letter, and they declined to talk with me, which I certainly understand. And I would not press this on them.

Grey was later recalled by defendant and further cross-examined by the prosecution. At that time, Grey testified that Bruhmuller and his biological father were estranged, adding that the father did not attend his son's funeral. At the end of Grey's testimony, the following exchange took place:

Q  [THE PROSECUTOR] But in spite of all that, he took it upon himself to give you an opinion about what the sentence should be in this case?

A  [GREY] He didn't tell me what he thought the sentence should be. What he said was—and he acknowledged that he was not a part of Kenneth's life as an adult, or even for much of his childhood. He said that from his perspective and from where he was in his own life, that he would be content with the idea of somebody serving a life sentence without the possibility of parole.

Defendant did not object to Grey's testimony concerning her contact with Bruhmuller's family.

STATE v. THOMPSON

[359 N.C. 77 (2004)]

In *Booth*, the United States Supreme Court held that the admission of any victim-impact evidence violates the Eighth Amendment because such evidence "is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 502-03, 96 L. Ed. 2d at 448. Pursuant to a Maryland state law permitting it to do so, the prosecution at trial read to the jury a victim impact statement which noted the sentiments and opinions of the victim's family members. *Id.* at 498-99, 96 L. Ed. 2d at 446. The Court in *Booth* concluded that evidence that "describe[s] the personal characteristics of the victims and the emotional impact of the crimes on the family" or which "set[s] forth the family members' opinions and characterizations of the crimes and the defendant" is inadmissible because neither relate to defendant's blameworthiness. *Id.* at 502, 96 L. Ed. 2d at 448; *see also Gathers*, 490 U.S. at 811, 104 L. Ed. 2d at 883 (holding that a prosecutor's comments regarding the personal characteristics of a victim were "indistinguishable in any relevant respect from that in *Booth*" and, therefore, were violative of the Eighth Amendment).

However, in *Payne*, the United States Supreme Court overruled *Booth* and *Gathers* in part by holding that the admission of victim-impact evidence in a capital proceeding was not a *per se* violation of the Eighth Amendment. 501 U.S. at 827, 115 L. Ed. 2d at 736. "[E]vidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* Thus, such evidence is admissible unless it "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825, 115 L. Ed. 2d at 735.

Although the Court in *Payne* concluded that *Booth* and *Gathers* were "wrongly decided and should be, and now are, overruled," *id.* at 830, 115 L. Ed. 2d 739, the Court stated that this holding was limited to the portions of *Booth* and *Gathers* concerning "evidence and argument relating to the victim and the impact of the victim's death on the victim's family." *Id.* at 830 n.2, 115 L. Ed. 2d at 739 n.2. The Court noted that "*Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment" and that "[n]o evidence of the latter sort was presented at the trial in [*Payne*]." *Id.* Thus, defendant is correct in stating that the portion of *Booth* which holds that "the family members' opinions and characterizations of the crime[]" and the defendant are *per se*

inadmissible was undisturbed by *Payne*. *Booth*, 482 U.S. at 502, 508-09, 96 L. Ed. 2d at 448, 451-52.

However, we do not agree that Grey's testimony at defendant's trial was the same type of evidence excluded in *Booth*. In *Booth*, a victim-impact statement prepared by the Maryland Division of Parole and Probation was read aloud to the jury. This victim impact statement, which was ultimately found inadmissible, contained statements by the victims' son that his parents were

> "butchered like animals" and that he "doesn't think anyone should be able to do something like that and get away with it." The VIS also noted that the [victims'] daughter "could never forgive anyone for killing [her parents] that way. She can't believe that anybody could do that to someone. The victims' daughter states that animals wouldn't do this. [The perpetrators] didn't have to kill because there was no one to stop them from looting. . . . The murders show the viciousness of the killers' anger. She doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this."

*Booth*, 482 U.S. at 508, 96 L. Ed. 2d at 452 (alteration in original) (citations omitted).[1]

---

1. The Booth Court attached the victim-impact statement at issue in an appendix to its decision. The portions of that statement relevant to this issue are excerpted below:

The victims' granddaughter . . . vividly remembers every detail of the days following her grandparents' death. Perhaps she described the impact of the tragedy most eloquently when she stated that it was a completely devastating and life altering experience.

. . .

The victims' son feels that his parents were not killed, but were butchered like animals. He doesn't think anyone should be able to do something like that and get away with it. He is very angry and wishes he could sleep and not feel so depressed all the time. He is fearful for the first time in his life, putting all the lights on and checking the locks frequently. His children are scared for him and concerned for his health. They phone him several times a day. At the same time he takes a fearful approach to the whereabouts of his children. He also calls his sister every day. He states that he is frightened by his own reaction of what he would do if someone hurt him or a family member. He doesn't know if he'll ever be the same again.

. . .

The victims' daughter attended the defendant's trial and that of the co-defendant because she felt someone should be there to represent her parents. She had never been told the exact details of her parents' death and had to listen to the

The testimony at issue in this case is of an entirely different nature than the statements admitted in *Booth*. Grey, a defense witness, simply testified that the Alexanders did not respond to her inquiries with respect to the defendant's remorse for the murder of their son and the defendant's "willingness" to plead guilty and that Grey understood why. As the Alexanders never actually communicated with Grey, her testimony was not "the family members' opinions and characterizations of the crime[] and the defendant." *See id.*, at 502, 96 L. Ed. 2d at 448. Moreover, the evidence was neither admitted through a family member nor through a formally prepared victim impact statement. Therefore, Grey's testimony is not an inadmissible victim impact statement and it does not violate *Booth* or *Payne*. This assignment of error is overruled.

Defendant next argues that he is entitled to a new sentencing hearing based upon prejudicial errors in the trial court's failure to properly submit five mitigating circumstances to the jury for consideration. Defendant argues that he requested peremptory instructions as to each mitigating circumstance and that the requested mitigating circumstances were supported by the evidence at trial. He asks that this Court review these assigned errors both individually and cumulatively.

[4] First, defendant assigns error to the trial court's failure to submit to the jury the nonstatutory mitigating circumstance that "[t]he defendant was willing to plead guilty to [f]irst [d]egree [m]urder and serve the rest of his life in prison without parole." According to

---

medical examiner's report. After a certain point, her mind blocked out and she stopped hearing. She states that her parents were stabbed repeatedly with viciousness and she could never forgive anyone for killing them that way. She can't believe that anybody could do that to someone. The victims' daughter states that animals wouldn't do this. They didn't have to kill because there was no one to stop them from looting. Her father would have given them anything. The murders show the viciousness of the killers' anger. She doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this. She feels that the lives of her family members will never be the same again.

. . .

The victims' family members note that the trials of the suspects charged with these offenses have been delayed for over a year and the postponements have been very hard on the family emotionally. The victims' son notes that he keeps seeing news reports about his parents' murder which show their house and the police removing their bodies. This is a constant reminder to him. The family wants the whole thing to be over with and they would like to see swift and just punishment. *Booth*, 482 U.S. at 511-14, 96 L. Ed. 2d at 454-56.

**STATE v. THOMPSON**

[359 N.C. 77 (2004)]

defendant, the trial court's refusal to instruct the jury as to this mitigating circumstance is prejudicial error for which he must receive a new sentencing hearing.

Preliminarily, we note that the trial court did submit three nonstatutory mitigating circumstances from which the jury could determine that defendant had accepted responsibility: "[a]fter his arrest, the defendant admitted to shooting Mr. Bruhmuller and taking money from the store"; "[t]he defendant has expressed regret for the murder of Kenneth Bruhmuller," and "[t]he defendant has accepted responsibility for his criminal conduct." The trial court also instructed the jury as to the statutory catchall mitigating circumstance, which is "[a]ny other circumstance or circumstances arising from the evidence which one or more . . . [jurors] deems to have mitigating value." *See* N.C.G.S. § 15A-2000 (f)(9) (2003). The jury found as a mitigating circumstance that defendant accepted responsibility for his conduct.

Following his conviction for first-degree murder, defendant submitted a written request for peremptory instruction on a number of mitigating circumstances, including the "willing to plead" mitigating circumstance. During the sentencing-phase charge conference, the trial court questioned whether the mitigating circumstance could properly be submitted to the jury. The State argued that the mitigating circumstance should not be submitted because defendant never entered a guilty plea to first-degree murder and because by pleading not guilty, defendant denied "every element of the offense." While acknowledging defendant's right to plead not guilty, the State argued that, in so pleading, defendant gave up his right to have his purported *willingness* to plead guilty to first-degree murder submitted as a mitigating circumstance. Defendant pointed to Grey's testimony that defendant "had expressed a considerable degree of remorse and a willingness to take a sentence of life imprisonment." Following further discussion, the trial court ruled that defendant was not entitled to the mitigating circumstance.

This Court recently addressed a similar assignment of error in *State v. Carroll*, 356 N.C. 526, 573 S.E.2d 899 (2002), *cert. denied*, 539 U.S. 949, 156 L. Ed. 2d 640 (2003). In *Carroll*, the Court determined that the defendant was not entitled to a nonstatutory mitigator that he accepted responsibility by offering to plead guilty to second-degree murder. The defense attorney in *Carroll* moved to present evidence that defendant "was 'willing to accept responsibility and take a plea . . . of 391 to 479 months and that he made that offer.' " *Id.* at 548, 573 S.E.2d at 913. Even so, the attorney conceded that this evidence

was normally " 'precluded from the case in chief' " because it " 'would be considered part of a settlement conference.' " *Id.* The defense attorney noted that negotiations were ongoing and that defendant was willing to plead guilty to second-degree murder. *Id.* However, the State had never made a plea offer. *Id.* The State informed the trial court that, although "the defense had made several suggestions concerning what the State should offer defendant, no one ever made clear whether 'defendant ha[d] himself offered to take any time.' " *Id.* The trial court denied the motion because the evidence was not relevant and because it was " 'relative to pretrial negotiations.' " *Id.* Defense counsel renewed the motion, which the trial court again denied, following the trial court's jury charge. *Id.*

In *Carroll*, this Court determined that the trial court did not err by refusing to allow the defendant to present mitigating evidence as to his offer to plead guilty to second-degree murder. In so doing, the Court reasoned as follows:

> In the present case, the evidence is at best conflicting as to defendant's willingness to plead guilty to second-degree murder. From our review of the record, we can conclusively determine only that defendant's attorney tried repeatedly to obtain a plea offer from the State. Because the State never made an offer, we cannot know with certainty whether defendant would have indeed pled guilty to second-degree murder and accepted a plea agreement.

> Assuming *arguendo* that defendant was willing to plead guilty to second-degree murder, this is evidence only of defendant's willingness to lessen his exposure to the death penalty or a life sentence upon a first-degree murder conviction. Defendant's willingness to accept a second-degree murder plea would be more likely a result of his assessment of the risk of trial than his willingness to accept responsibility for his actions. Indeed, defendant admitted to police that he was likely to get the death penalty for his crime. Moreover, defendant chose to plead not guilty and proceed to trial rather than enter a guilty plea and accept responsibility for the killing. Having made this choice, defendant cannot now complain that he should have been allowed to reveal during sentencing his hypothetical willingness to enter a guilty plea to a lesser crime.

> Finally, the trial court did submit to the jury the nonstatutory mitigating circumstances that "[d]efendant at an early stage in the

proceedings admitted his involvement in the capital felony to law enforcement officers," "[d]efendant's cooperation and the information he provided were valuable to law enforcement," "[d]efendant has expressed remorse for the murder," "[d]efendant told the officers through his mother where to find him and peacefully surrendered." The trial court also submitted to the jury the catchall mitigating circumstance. *See* N.C.G.S. § 15A-2000 (f)(9). Accordingly, the jury was given ample means to determine whether defendant had accepted responsibility for his actions.

*Id.* at 548-49, 573 S.E.2d at 914.

As in *Carroll*, there is no definitive evidence in the record that the State offered, or that defendant would have accepted, a plea to receive a lesser sentence. Assuming Grey's testimony was sufficient to infer that defendant would have pled guilty to first-degree murder in return for receiving a sentence of life without parole, it is difficult to assess whether defendant's willingness to do so had mitigating value in demonstrating his admission of responsibility. It may have indicated only his "willingness to lessen his exposure to the death penalty." *Id.* at 549, 573 S.E.2d at 914. Furthermore, like the defendant in *Carroll*, defendant in the present case chose to plead not guilty and proceed to trial. "Having made this choice, defendant cannot now complain that he should have been allowed to reveal during sentencing his hypothetical willingness to enter a guilty plea to a lesser crime." *Id.*

For these reasons, we hold that the trial court did not err by refusing to submit a "willing to plead" mitigating circumstance to the jury. Accordingly, we overrule this assignment of error.

[5] Defendant next assigns error to the trial court's failure to submit the N.C.G.S. § 15A-2000(f)(1) and (f)(7) mitigating circumstances to the jury. Section 15A-2000(f)(1) concerns whether "defendant has no significant history of prior criminal activity" and section 15A-2000(f)(7) concerns "[t]he age of the defendant at the time of the crime." Defendant argues that the trial court should have submitted these mitigating circumstances *ex mero motu*, despite his failure to request them.

We agree that a defendant's failure to request a jury instruction on the f(1) mitigating circumstance does not relieve the trial court of its duty to instruct the jury as to that mitigating circumstance if the evidence supports instruction. *See State v. Mahaley*, 332 N.C. 583, 597,

423 S.E.2d 58, 66 (1992) (noting that the f(1) mitigating circumstance must be submitted "without regard to the wishes of the State or the defendant"), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). However, before submitting the f(1) mitigating circumstance, "a trial court must 'determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity.' " *State v. Atkins*, 349 N.C. 62, 87, 505 S.E.2d 97, 113 (1998) (quoting *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589-70, 604 (1988)), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). "A significant history of prior criminal activity . . . is one likely to influence the jury's sentence recommendation." *Id.* at 88, 505 S.E.2d at 113. "When the trial court is deciding whether a rational juror could find the (f)(1) mitigating circumstance to exist, the nature and age of the prior criminal activities are important, and the mere number of criminal activities is not dispositive." *State v. Greene*, 351 N.C. 562, 569, 528 S.E.2d 575, 580 (finding that the trial court did not err by refusing to submit the f(1) mitigating circumstance where "much of defendant's prior criminal activity was recurrent, recent, and similar in nature to his conduct" in that case), *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000).

During sentencing, the State presented evidence that defendant had twice previously committed armed robbery of a Greensboro Bojangles restaurant and, in the process, kidnapped five victims. The evidence tended to show that at closing time on 17 March 1990, defendant entered a Bojangles restaurant wearing a "ski mask type thing" and carrying a sawed-off, pump-type shotgun. Defendant held a bystander at gunpoint and demanded money from Billy Adams, the assistant manager. Adams gave defendant money from the drive-through cash register only, explaining that the front registers had already been cleared out. Defendant then told Adams to give him the money kept in a separate "lock box." Adams complied with defendant's demands while the remaining employees hid in a closet. Defendant left with approximately $400.00.

Evidence further indicated that the following month, during the early morning hours of 8 April 1990, defendant entered the same Bojangles while holding an employee at gunpoint. Again, defendant's face was covered, and he was carrying a "pump type shotgun" with the "stock end cut off." Defendant ordered three female employees, including a pregnant woman named April Dobbins, into the store's freezer. Defendant blocked the freezer door with a metal rack. While holding the shotgun behind manager Thomas Lenk, defendant

ordered him to walk to the office in the back of the store. There, defendant instructed Lenk to open the safe. Lenk testified at the sentencing proceeding that defendant stood behind him with the shotgun as he complied with defendant's instructions. After Lenk gave defendant the money in the safe, defendant shot the office phone. Dobbins testified that upon hearing the shot, she thought defendant had shot Lenk. Defendant then ordered Lenk to the front of the store, where he instructed him to empty the registers. After Lenk did so, defendant escorted Lenk, shotgun in hand, into the store's cooler. Lenk testified that, as he walked to the cooler, he prayed defendant would not shoot him.

Detective Gary Evers of the City of Greensboro Police Department testified that he was assigned to investigate the two robberies, which occurred less than one month apart. At trial, Evers detailed how his investigation led him to defendant and the eventual seizure of items relating to the robberies from defendant's residence and vehicle. Following the seizure, defendant gave a detailed statement, admitting that he committed the two robberies. Defendant, who was twenty-two years old at the time of the crimes, pled guilty to two counts of robbery with a dangerous weapon and five counts of second-degree kidnapping. The counts were consolidated into one judgment, and defendant received a twenty-two-year sentence. Defendant served eight years of his sentence and was released in 1998.

Grey testified that, at the time of the 1990 robberies, defendant was experiencing financial difficulty and having a hard time finding employment. Also, it was revealed at sentencing that defendant had worked at that same Bojangles before committing the two armed robberies.

Considering the evidence of defendant's prior felony convictions for five second-degree kidnappings and two armed robberies, as well as the similarities between defendant's conduct leading to those convictions and the facts underlying Bruhmuller's murder, we determine that no "rational jury could conclude that defendant had no *significant* history of prior criminal activity." *Atkins*, 349 N.C. at 87, 505 S.E.2d at 113 (quoting *Wilson*, 322 N.C. at 143, 367 S.E.2d at 604). Additionally, we note that the jury found seven aggravating circumstances to exist based on defendant's prior convictions, namely that defendant had "been previously convicted of a felony involving the use or threat of violence to the person" on seven previous occasions. *See* N.C.G.S. § 15A-2000(e)(3) (2003). Although defendant is correct

that the (f)(1) "no significant history of prior criminal activity" miti-gating circumstance can, and in some cases should, be submitted simultaneously with multiple (e)(3) aggravating circumstances, *see State v. Bone*, 354 N.C. 1, 16-17, 550 S.E.2d 482, 492 (2001), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002), given the particular facts underlying the submission of seven (e)(3), prior felony con-viction, aggravating circumstances in this case, " 'it is unimaginable that . . . the same jury might simultaneously have found that ag-gravating circumstance to be so irrelevant that it could reason-ably infer the existence of the mitigating circumstance in N.C.G.S. [] 15A-2000(f)(1).' " *State v. Jones*, 339 N.C. 114, 158, 451 S.E.2d 826, 850 (1994) (quoting *State v. Artis*, 325 N.C. 278, 316, 384 S.E.2d 470, 491 (1989), *judgment vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)) (alteration in original), *cert. denied*, 515 U.S. 1169; 132 L. Ed. 2d 873 (1995). Accordingly, this assignment of error is overruled.

**[6]** We likewise reject defendant's argument that the trial court erred by not submitting the f(7) mitigating circumstance, "[t]he age of the defendant at the time of the crime," to the jury *ex mero motu*. In sup-port of this assignment of error, defendant argues that although his chronological age was thirty-two years at the time of the murder, he functioned at a significantly younger level. In particular, defend-ant points to Dr. Hilkey's testimony that he exhibited aspects of a dependent personality disorder, lacked internal skills to respond maturely to stressful situations, and functioned emotionally as an adolescent. Defendant further notes that he presented evidence of "family violence and abuse" and that the trial court found the evi-dence sufficient to submit a nonstatutory mitigating circumstance that he "function[ed] emotionally at the age of an adolescent."

During the sentencing phase, Dr. Hilkey testified that defendant suffered from chronic depression and a severe personality disorder. He stated that defendant was very uncomfortable with close relation-ships, could not sustain meaningful relationships, and lacked the abil-ity to be flexible and to deliberate regarding his thoughts. Dr. Hilkey further testified that defendant behaved in a very childlike manner and was dependent on others. Dr. Hilkey also testified that defendant functioned better in structured environments where there was less stress. According to Dr. Hilkey, defendant's emotional functioning was like that of an adolescent whose thinking is rigid, is impulsive at times, and has the right intentions, but ultimately fails.

As defendant suggests in his brief, there was also evidence intro-duced that his father was sometimes absent from the family structure

**STATE v. THOMPSON**

[359 N.C. 77 (2004)]

when defendant was a child, abused alcohol, created a restrictive environment for his family when he was present, and was abusive, particularly toward defendant's mother. Dr. Hilkey testified that the father's alcohol abuse was an environmental and genetic factor contributing to defendant's alcohol and drug dependency.

For the purpose of assessing whether the f(7) mitigating circumstance should have been submitted, this Court considers age a "flexible and relative concept." *State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986). Thus, "chronological age is not the determinative factor in concluding this mitigating circumstance exists." *State v. Gainey*, 355 N.C. 73, 105, 558 S.E.2d 463, 483, *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002). "The defendant's immaturity, youthfulness, or lack of emotional or intellectual development is also relevant." *Id.* "Nevertheless, evidence showing emotional immaturity is not viewed in isolation, particularly where other evidence shows 'more mature qualities and characteristics.' " *State v. Spruill*, 338 N.C. 612, 660, 452 S.E.2d 279, 305 (1994) (quoting *Johnson*, 317 N.C. at 393, 346 S.E.2d at 624), *cert. denied*, 516 U.S. 834, 133 L. Ed. 2d 63 (1995).

> Although evidence showing emotional immaturity is relevant to submission of the (f)(7) mitigating circumstance, "this Court will not conclude that the trial court erred in failing to submit the age mitigator [*ex mero motu*] where evidence of defendant's emotional immaturity is *counterbalanced by other factors* such as defendant's chronological age, defendant's apparently normal intellectual and physical development, and defendant's lifetime experience."

*State v. Meyer*, 353 N.C. 92, 101, 540 S.E.2d 1, 6 (2000) (quoting *State v. Steen*, 352 N.C. 227, 257, 536 S.E.2d 1, 19 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001) (alteration in original) (emphasis added), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 54 (2001).

Notwithstanding defendant's summary of the facts at trial, additional evidence was presented contradicting Dr. Hilkey's testimony and tending to show that defendant functioned emotionally as an adult. He was thirty-two years old when he murdered Bruhmuller. Defendant graduated from high school in 1987 with a C average, and his I.Q. was within the normal range. Defendant moved in with his girlfriend, Ivey Milton, and her children, developing a spouse-like relationship with Milton and becoming a father-figure for Milton's two children and two other minors who lived with them. He continued to

have contact with the family in that capacity even after he was arrested. Defendant worked at Domino's and other places, contributing both financial and emotional support to the family even in Milton's absence. Between November 1999 and January 2001, defendant paid the family's rent on time, with the exception of one month.

We determine that these factors, which tend to show defendant's "apparently normal intellectual and physical development," *see Meyer*, 353 N.C. at 101, 540 S.E.2d at 6 (quoting *Steen*, 352 N.C. at 257, 536 S.E.2d at 19), counterbalance Dr. Hilkey's testimony. Moreover, while defendant is correct that the trial court submitted a nonstatutory mitigating circumstance that "[d]efendant functions emotionally at the age of an adolescent," the jury did not find that circumstance to exist and to have mitigating value. Accordingly, the trial court did not err in failing to submit "[t]he age of the defendant" to the jury *ex mero motu* as a mitigating circumstance. This assignment of error is overruled.

**[7]** In his next assignment of error, defendant contends that the trial court committed reversible error by refusing to give peremptory instructions on two nonstatutory mitigating circumstances as submitted by defense counsel. Specifically, defendant requested, in writing, peremptory instructions as to the following: (1) "After his arrest, [d]efendant confessed to shooting the [sic] Mr. Bruhmuller and taking money from the store"; and (2) "The [d]efendant has consistently expressed remorse for the murder of Kenneth Bruhmuller." Defendant argues that in denying the requested peremptory instructions, the trial court substituted its own subjective opinion for the jury's determination of these two nonstatutory mitigating circumstances. We disagree.

Regarding defendant's first request for a mitigating circumstance on his "confession," the following exchange took place:

MR. CAUSEY: The first nonstatutory [mitigating circumstance] would be language to the effect that "After his arrest, the defendant, or John Thompson, "confessed to shooting Kenneth Bruhmuller and taking money from the store."

THE COURT: I've got an issue I'd like to raise with you about that terminology. And it arises from the same basis on which I gave an instruction to the jury at the [guilt] phase. I'm not sure that the statement that was taken from the defendant constitutes

a confession, so much as an admission. Would you be satisfied with an instruction to the effect that, "After his arrest, the defendant admitted to shooting Mr. Bruhmuller and taking money from the store"?

Mr. Causey: Yes.

The Court: I think that is uncontroverted, having amended it to that extent.

Do you want to be heard on the request for a peremptory on that, Mr. Wood?

Mr. Wood [Prosecutor]: No, Your Honor.

The Court: I will submit a peremptory, nonstatutory peremptory instruction on that.

As for defendant's second requested mitigating instruction on remorse, the transcript reflects the following:

Mr. Causey: Judge, our second nonstatutory [mitigating circumstance] would be, "The defendant, John Thompson, has consistently expressed remorse for the murder of Kenneth Bruhmuller." And again, that would have come from Dr. Hilkey at the latter part of today.

The Court: Again, I have problems with the terminology, first with "consistently." We've got evidence from Dr. Hilkey and Ms. Grey of three, I think three statements attributed to the defendant—well, the statement at the time he was arrested, one to Grey, and one to Hilkey, and I don't—I'm having some difficulty in comprehending how that should be submitted, at least as a peremptory as "consistently."

Mr. Causey: If we removed the phrase "consistently" and just go with that language?

The Court: I would be—I would think that would be more in line with the evidence.

Mr. Causey: Okay.

The Court: Now, what about—I also—I think there's clear expression of regret. I don't know if what I've heard constitutes what I understand remorse to be.

STATE v. THOMPSON

[359 N.C. 77 (2004)]

MR. CAUSEY: Well, we would say that—I would contend that the questions that were asked of Dr. Hilkey were in the phraseology of remorse, and his testimony—

THE COURT: Well, Dr. Hilkey doesn't get to define the word "remorse"—

MR. CAUSEY: Right.

. . .

THE COURT: And the jury is also instructed that they're [sic] not required to accept the opinion of an expert to the exclusion of other facts and circumstances established by competent evidence in the case.

MR. CAUSEY: I guess my point would be, if that's the language they heard from the witness stand, is it up to the jury to either find it or not find it or give it—

THE COURT: Well, it would be. And if you want to submit remorse, I'll be happy to do that, but I'm certainly—I don't believe that that would merit a peremptory instruction.

MR. CAUSEY: Okay. What—I'm just asking, what phrase are you thinking that we could interchange.

THE COURT: Well, you know, it's up to you, Bill.

MR. CAUSEY: Yeah.

THE COURT: If you wanted to ask for regret[,] I think there's been an expression of regret on at least three occasions that it happened.

MR. CAUSEY: And I just want to make sure I'm clear. If we say, "The defendant has expressed regret for the murder of Kenneth Bruhmuller," would we get—are you saying we would get the peremptory?

THE COURT: I think you would be entitled to a peremptory on that phrasing.

MR. CAUSEY: So, yes, I would change that to "The defendant has expressed regret for the murder of Kenneth Bruhmuller," and ask that be given peremptorily. . . .

. . .

THE COURT: Then, upon a request, as I understand it, an amended request to submit the fourth mitigating circumstance as, "Consider whether the defendant expressed regret for the murder of Kenneth Bruhmuller," and—that's what you're requesting at this time? Is that the phrasing you are—

MR. CAUSEY: Yes, regret.

Thereafter, the trial court agreed to give the following non-peremptory mitigating circumstance: "Consider whether the defendant has expressed remorse for the murder of Kenneth Bruhmuller." Defense counsel later informed the trial court that he would "like to abandon" the instruction concerning remorse "and just leave the one that says 'regret' " because he did not "want the jury to have to pick and choose" between remorse and regret. The trial court complied, submitting peremptory nonstatutory mitigating instructions as to defendant's admission of guilt and defendant's regret. After the jury was so charged, defense counsel stated that he was renewing all "previous objections." Neither nonstatutory mitigator was found by the jury.

"A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (2003). A defendant is therefore "precluded from obtaining relief when the error was invited by his own conduct." *Gainey*, 355 N.C. at 108, 558 S.E.2d at 485. "To the extent that defendant agreed with the trial court's manner of instruction, defendant has invited any alleged error, and he may not obtain relief from such error." *Id.* at 110, 558 S.E.2d at 486.

In *State v. Wilkinson*, the defendant submitted a jury instruction in writing on the meaning of "depravity of mind" that read, " 'a circumstance which makes a murder *unusually* heinous, atrocious, or cruel.' " 344 N.C. 198, 212-13, 474 S.E.2d 375, 382-83 (1996). The trial court deleted the word "unusually" and, in its place, inserted the word "especially." *Id.* at 213, 474 S.E.2d at 383. The defendant indicated to the trial court that he had no objection to the substitution, but argued on appeal that the modification was plain error. *Id.*

This Court noted in *Wilkinson* that, normally, where a defendant fails to object to an error at trial, we would determine whether the alleged error constituted plain error. *Id.* "However, this Court has consistently denied appellate review to defendants who have attempted to assign error to the granting of their own requests." *Id.*

Because the defendant agreed to the substitution, the Court concluded that the defendant was complaining on appeal about an instruction he had actually requested; therefore, any error was invited by the defendant. *Id.* at 214, 474 S.E.2d at 383; *see also State v. White*, 349 N.C. 535, 570, 508 S.E.2d 253, 275 (1998) ("Where a defendant tells the trial court that he has no objection to an instruction, he will not be heard to complain on appeal."), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999).

Here, the above-noted portions of the sentencing phase transcript demonstrate that defendant, like the defendant in *Wilkinson*, invited any error in the trial court's refusal to give peremptory instructions to the jury on the nonstatutory mitigating circumstances that he confessed and that he was remorseful. Defendant's attorney actively agreed to the instructions the trial court thought appropriate. In so doing, defendant amended the proposed peremptory jury instructions that he had previously submitted in writing to the court. Furthermore, concerning the mitigating circumstance of remorse, defendant later abandoned the modified instruction, which had been allowed by the trial court. The trial court did not deviate from defendant's agreed upon instruction on regret. Therefore, defendant invited any error in the trial court's actions. Accordingly, defendant is not entitled to review based upon this assignment of error and it is overruled.

[8] Defendant next assigns as error the trial court's deviation from the standard peremptory, nonstatutory mitigating instruction approved by this Court in *State v. Lynch*, 340 N.C. 435, 459 S.E.2d 679 (1995), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996). Defendant argues that in adding the last paragraph of the peremptory, nonstatutory instructions set out below, the trial court invited jury nullification by repeatedly emphasizing that the jury could reject unchallenged evidence.

In *Lynch*, this Court approved the following phrasing for peremptory instructions on nonstatutory mitigating circumstances:

"All of the evidence tends to show [named mitigating circumstance]. Accordingly, as to this mitigating circumstance, I charge that if you find the facts to be as all the evidence tends to show, you will answer, 'Yes,' as to the mitigating circumstance Number [#] on the issue and recommendation form if one or more of you deems it to have mitigating value."

340 N.C. at 476, 459 S.E.2d at 700.

## STATE v. THOMPSON

[359 N.C. 77 (2004)]

Defendant contends that by approving certain phrasing for peremptory, nonstatutory mitigating instructions in *Lynch*, this Court modified prior law which allowed the jury to reject a nonstatutory mitigating circumstance even when the trial court finds that all the evidence tends to show its existence. We disagree.

Our opinion in *Lynch* simply stated that the particular peremptory instruction given by the trial court in that case was a correct statement of law. *Id.* Even when a defendant is entitled to a peremptory instruction as to a nonstatutory mitigating circumstance, jurors can reject that nonstatutory mitigating circumstance, either because the jurors find that it does not exist *or* because they determine that it does not have mitigating value.

To find a nonstatutory mitigating circumstance, a juror must first determine "whether the proffered circumstance exists factually. Jurors who find that a nonstatutory mitigating circumstance exists are then to consider whether it should be given any mitigating weight." *State v. Green*, 336 N.C. 142, 173, 443 S.E.2d 14, 32, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 574 (1994). Even where defendant is entitled to a peremptory instruction, "[t]he jury may still reject that circumstance if it finds the evidence is not convincing or if it finds the circumstance does not have mitigating value." *Jones*, 339 N.C. at 162, 451 S.E.2d at 852-53. *See Green*, 336 N.C. at 173-74, 443 S.E.2d at 32-33; *State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993). Similarly, as we stated in *State v. McCollum*, "It is well settled that a peremptory instruction does not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility." 334 N.C. 208, 229, 433 S.E.2d 144, 155 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

In the present case, the trial court gave peremptory instructions concerning 14 of the 17 nonstatutory mitigating circumstances submitted to the jury. As to each of those mitigating circumstances, the trial court gave the instruction, or one similar to it, recited below:

You would find this mitigating circumstance if you do find that the defendant [insert mitigating circumstance], and that this circumstance does have mitigating value.

The defendant has the burden of establishing this mitigating circumstance by the preponderance of the evidence. All of the evidence tends to show that this circumstance does exit. Accordingly, as to this mitigating circumstance number [insert #],

I charge that if one or more of you find the facts to be as all the evidence tends to show, and further deems that to have mitigating value you would so indicate by having your foreman write "yes" in the space provided after mitigating circumstance number [insert #] on the Issues and Recommendation form.

If none of you finds this circumstance to exist, even though there is no evidence to the contrary, or if none of you deems it to have mitigating value, you would so indicate by having your foreman write "no" in that space.

The trial court's peremptory instruction on nonstatutory mitigating circumstances in the case *sub judice* was a correct statement of the law. *Cf. Lawrence*, 352 N.C. at 31-32, 530 S.E.2d at 826 (approving a peremptory instruction similar to the one given in the present case despite the defendant's argument that "once a peremptory instruction is given as to a mitigating circumstance, the only question that remains is how much weight the jury will give the circumstance"). Accordingly, we reject defendant's assignment of error.

[9] Finally, because we find no error with respect to the trial court's jury instructions and submission of the mitigating circumstances discussed *supra*, there is no need to consider defendant's cumulative error argument on this point.

[10] By his next assignment of error, defendant contends that two of the seven N.C.G.S. § 15A-2000(e)(3) (prior violent felony conviction) aggravating circumstances submitted to and found by the jury were not supported by the evidence. As to these two aggravators, the trial court instructed the jury that it must determine whether defendant had "been previously convicted of a felony involving the use or threat of violence to the person, with regard to an armed robbery of Billy Adams on March 17, 1990," and whether defendant had "been previously convicted of a felony involving the use or threat of violence to the person, with regard to an armed robbery of April Dobbins on April 8, 1990." Defendant correctly points out that the indictments for these two felonies listed "Bojangles Restaurant" as the victim of the robbery, with "Billy Adams" and "April Dobbins" as being "present and in attendance." Defendant further notes that the evidence at trial, particularly the testimony of Adams and Dobbins, showed that the restaurant was the entity that was robbed, while the individuals listed in the indictments were merely present.

In support of his argument, defendant compares his case to one in which an indictment for armed robbery varies from proof of the

charge submitted at trial. According to defendant, "[j]ust as nonsuit would have been warranted had the [S]tate presented these indictments alleging robberies of Bojangles, and then sought convictions for robberies of two entirely different named victims, so too is there a fatal variance here between the [S]tate's indictments and evidence and the corresponding instructions and findings on these aggravating factors." We disagree.

When the prosecution submitted the seven e(3) aggravating circumstances at trial, defendant objected, but on the grounds that the circumstances should be consolidated into one aggravator. Thus, defendant did not properly preserve this issue for appellate review, *see* N.C. R. App. P. 10(b)(1) ("In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context."), and is only entitled to relief if the trial court's submission of defendant's prior felonies was plain error. *State v. Odom*, 307 N.C. 655, 659-60, 300 S.E.2d 375, 378 (1983).

Furthermore, defendant misapprehends the law regarding the effect of a variance between the designated property owner in an armed-robbery indictment and the evidence as to the property owner presented at trial. It is well established that an indictment for armed robbery need not allege that the property taken "be laid in a particular person." *State v. Spillars*, 280 N.C. 341, 345, 185 S.E.2d 881, 884 (1972). Likewise, "[v]ariance between the allegations of the [armed robbery] indictment and the proof in respect of the ownership of the property taken is not material." *State v. Ballard*, 280 N.C. 479, 485, 186 S.E.2d 372, 375 (1972). "The gravamen of the offense is the endangering or threatening of human life by the use or threatened use of firearms or other dangerous weapons in the perpetration of or even in the attempt to perpetrate the crime of robbery." *Id.* "An indictment for robbery will not fail if the description of the property is sufficient to show it to be the subject of robbery and negates the idea that the accused was taking his own property." *Spillars*, 280 N.C. at 345, 185 S.E.2d at 884; *see also State v. Pratt*, 306 N.C. 673, 681, 295 S.E.2d 462, 467 (1982) ("As long as it can be shown defendant was not taking his own property, ownership need not be laid in a particular person to allege and prove robbery"); *State v. Jackson*, 306 N.C. 642, 650-51, 295 S.E.2d 383, 388 (1982) ("As long as the evidence shows the defendant was not taking his *own* property, ownership is irrelevant . . . . A tak-

ing from one having the care, custody or possession of the property is sufficient").

Here, both the aggravating circumstances submitted to the jury and the evidence presented at trial, including the armed robbery indictments and the testimony of Adams and Dobbins, conveyed to the jury that those two employees of the property owner listed in the aggravating circumstances were present and endangered or threatened in the course of the armed robberies. It is further clear from both the indictments and other evidence admitted at trial that the property taken did not belong to defendant. In both instances, any inconsistency between the aggravating circumstance, indictment, and trial testimony was thus immaterial. Because we conclude that the trial court did not commit error, much less plain error, in submitting the challenged aggravating circumstances, we reject defendant's assignment of error as to this issue.

[11] Similarly, we reject defendant's related argument that the trial court erred in failing to dismiss his indictment for robbery with a dangerous weapon because the indictment omitted the essential element that the victim, Domino's Pizza, was "a legal entity capable of owning property." First, the cases cited by defendant in support of his argument are inapposite. *State v. Bell* found a fatal variance between a robbery indictment and the evidence presented at trial because although the indictment alleged that " 'Jean' Rogers" was robbed, all evidence at trial indicated " 'Susan' Rogers" was actually the victim. 270 N.C. 25, 29, 153 S.E.2d 741, 744 (1967). Thus, the facts in *Bell* distinguish that case from the instant case. *State v. Norman* concluded that an indictment for larceny must allege that an entity listed as the victim is " 'a legal entity capable of owning property' " because proof of offense of the ownership rights of another is an essential element of larceny. 149 N.C. App. 588, 593, 562 S.E.2d 453, 457 (2002) (quoting *State v. Woody*, 132 N.C. App. 788, 790, 513 S.E.2d 801, 803 (1999)). However, armed robbery and larceny are separate and distinct crimes with separate elements, and, as we noted above, an indictment for armed robbery is not fatally defective simply because it does not correctly identify the owner of the property taken.

Second, the property description in the robbery indictment was sufficient to demonstrate that the property did not belong to the defendant. Despite defendant's contentions to the contrary, it is irrelevant whether the indictment alleged that Domino's was a legal entity. Therefore, defendant's assignment of error as to this issue is overruled.

**[12]** Defendant next contends that during his sentencing hearing, the prosecutor engaged in improper closing argument by misrepresenting the facts and the law on two separate occasions. However, defendant did not timely object to either of the challenged portions of the prosecutor's arguments.

The first portion of allegedly improper prosecutorial argument is as follows:

> This is not a matter of you doing something to him. Don't let anybody imply to you at any point in this trial that you're doing this to him. Don't let anyone beg you not to take his life. That's not what's going on here. You're not doing this to him. He's doing it to you. He made all these decisions back on March 31, 2001. That day, he chose to take an innocent man, and play not only judge and jury, but executioner. And when he made that decision, he made your decision. This is not a matter of you doing it to him. He put himself in that seat, by his own acts and conduct.

According to defendant, this argument was improper because the prosecutor knew defendant was willing to plead guilty and accept a sentence of life imprisonment without parole; nonetheless, the prosecutor urged the jury to ignore defendant's "pleas for mercy." Defendant further contends that the argument misconstrues the law because the prosecutor, not defendant, was responsible for the capital trial, citing N.C.G.S. § 15A-2004(a) (2003) ("The State may agree to accept a sentence of life imprisonment for a defendant at any point in the prosecution of a capital felony . . ."). Finally, defendant contends that this line of argument, along with the prosecutor's elicitation of the Alexanders' opinion as to the proper sentence, misled the jury to believe that life imprisonment without parole was not an appropriate sentence and that defendant was responsible for forcing the jury to make a life-or-death sentencing decision.

Counsel is afforded wide latitude to present arguments "which are warranted by the evidence and are not calculated to mislead or prejudice the jury." *State v. Riddle*, 311 N.C. 734, 738, 319 S.E.2d 250, 253 (1984), *quoted in State v. Roache*, 358 N.C. 243, 301-02, 595 S.E.2d 381, 418-19 (2004). The standard for reviewing the propriety of a prosecutor's closing argument is well settled:

> Where a defendant fails to object to the closing arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. "To establish such an abuse, defendant

must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *See State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

*Roache*, 358 N.C. at 296-97, 595 S.E.2d at 415-16 (quoting *State v. Grooms*, 353 N.C. 50, 81, 540 S.E.2d 713, 732 (2000), *cert. denied*, 534 U.S. 838, 151 L. Ed. 2d 54 (2001)).

Moreover, "statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred." *Green*, 336 N.C. at 188, 443 S.E.2d at 41. Immediately preceding the challenged portion of his argument, the prosecutor reminded the jury that during jury selection, defendant's attorney asked the jury whether it "had what it took to make a life or death decision," and informed the jury that "it's time to make a decision." Later the prosecutor further emphasized to the jury, "When you make *your decision*, nobody's going to tell you its going to be easy . . . . [I]t's not as easy as saying just life or death." (Emphasis added.)

Furthermore, on numerous occasions, this Court has rejected the line of reasoning presented by defendant, finding no error or gross impropriety in similar prosecutorial arguments. *See State v. Prevatte*, 356 N.C. 178, 266, 570 S.E.2d 440, 489 (2002) (concluding that nothing in the prosecutor's argument that the defendant signed his own death warrant in the victim's blood "relieves the jury of its responsibility of fairness and impartiality"), *cert. denied*, 538 U.S. 986, 155 L. Ed. 2d 681 (2003); *State v. Walls*, 342 N.C. 1, 64, 463 S.E.2d 738, 772 (1995) (concluding that when the prosecutor argued that " '[we]'re the master of our destiny [and] we are responsible for the consequences of our actions,' " "[t]he thrust of the prosecutor's argument was not that the jury's decision was not final, but rather, that it was the defendant, who by choosing his course of actions, signed his own death warrant"), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996); *Jones*, 339 N.C. at 161, 451 S.E.2d at 852 (concluding that "it is highly doubtful that the jury thought itself relieved of the responsibility of recommending the defendant's sentence" when the prosecutor argued that the defendant " 'put himself in this position' " and " 'gave himself the death penalty' "); *State v. Reeves*, 337 N.C. 700, 734, 448 S.E.2d 802, 818 (1994) (finding, where the prosecution argued that the defendant

" 'wrote his own death warrant when he killed and brutalized [the victim]' " and that the " 'death warrant that he has wrote [sic] is here before you folks to sign, to make legal,' " that "[t]he jury should have in no way deduced from this that it was not their [sic] responsibility to impose the death penalty"), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995); *see also State v. McNeil*, 350 N.C. 657, 689, 518 S.E.2d 486, 505 (1999) ("This Court has repeatedly held it is not improper to argue that defendant, as judge, jury, and executioner, single-handedly decided the victim's fate"), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000).

Defendant's arguments are wholly without merit. The record reveals no indication that the prosecutor expressly or implicitly communicated to the jury that life imprisonment should not be considered, that the jury should disregard evidence of defendant's "pleas for mercy," or, most importantly, that defendant's sentence "was determined automatically" and was not the jury's upcoming decision. Here, the prosecution simply referenced decisions defendant made on the day of the murder and argued that those decisions led to the present proceeding and the jury's decision. "Clearly, the gist of the prosecutor's argument was that the defendant, by committing a capital crime, put himself in the position where he would be tried for his life." *Jones*, 339 N.C. at 161, 451 S.E.2d at 852. Because the prosecutor's argument in no way relieved the jury of its responsibility to recommend a sentence or to remain fair and impartial, the trial court did not err in failing to intervene *ex mero motu*.

[13] The second portion of the closing argument challenged by defendant is as follows:

> There are three *factors* present in this case, which I think would help you in making your decision on which of the aggravators and mitigators you should consider. And the three factors are, number one, this defendant has got a prior history for violent conduct. Number two, this defendant killed a totally helpless and innocent victim. And number three, based on the evidence you heard in the first phase of the trial, there can be no residual doubt in your mind about who pulled the trigger and who committed this crime. You have the right man. For these reasons, when you fill out your verdict sheet, I ask you, after weighing all the aggravating and mitigating factors, to sentence Mr. Thompson . . . to death for the murder of Kenneth Bruhmuller.

(Emphasis added.)

Defendant contends that in this portion of the closing argument, the prosecution erroneously attempted to submit additional non-statutory aggravating circumstances to the jury, including that defendant killed an innocent victim and that the jury should have no residual doubt as to defendant's guilt.

Again, we find defendant's argument meritless. Although it is common practice for practitioners and courts to interchange the proper term "circumstance" with "factor" when referring to aggravating circumstances, the prosecution's use of the term "factors" during closing argument clearly did not refer to any additional aggravating circumstances. The prosecution merely requested that the jury consider certain facts when weighing *both* mitigating and aggravating circumstances. In a separate section of his argument, the prosecution meticulously explained the eight statutory aggravating circumstances submitted to the jury. After the attorneys completed their arguments, the trial court instructed the jury as to only eight statutory aggravating circumstances. We presume, as we must, that the jury followed the instructions as submitted to it by the trial court. *See State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208, *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Accordingly, this assignment of error is overruled.

[14] In his next assignment of error, defendant contends that he is entitled to a new capital sentencing proceeding because he and his attorney were excluded from alleged unrecorded exchanges between the bailiff and the jury. Defendant contends that this alleged exchange necessarily altered the outcome of his capital sentencing proceeding and that his exclusion from this alleged communication violated his unwaivable constitutional right to be present at all stages of his capital murder trial, his right to a complete record for appeal, and the due process and confrontation clauses of the constitution of the United States and the State of North Carolina. We disagree.

According to the defendant, the alleged exchange took place on 14 November 2002 near the end of his capital sentencing proceeding and after the jury had begun its deliberations. The transcript reveals the following:

(Proceedings continued at 5:01 p.m. The defendant was present. The jury was not present.)

THE COURT: Bring them in.

I'm going to release the jury for the day at this time, counsel.

(The bailiff conferred with the [c]ourt at the bench.)

(Time was allowed.)

(Proceedings continued at 5:08 p.m. The defendant was present. The jury was not present.)

BAILIFF ODUM: They have a verdict, Judge.

THE COURT: All right.

Ladies and gentlemen, the jury has announced to the bailiff that it has reached a verdict.

From the above-quoted portion of the transcript, defendant infers that

an unrecorded, private exchange between the bailiff and the trial court substantially changed the course of these capital proceedings. Something in that exchange caused the court to reverse its order for the bailiff to bring the jury into the courtroom for an evening recess. Thus the exchange must have focused on the bailiff's perceptions or interpretations of the words or conduct of jury members. Those interactions may have been either the bailiff's direct communications with, or indirect observations of, one or more jurors. In either case, the interactions between the bailiff and the jury, like the private conference between the bailiff and the judge, occurred in defendant's absence, off the record, and at a pivotal stage of the life-and-death decision-making process.

We acknowledge that a defendant's right to be present during all stages of his trial is guaranteed by the constitutions of the United States and the State of North Carolina. *State v. Golphin*, 352 N.C. 364, 389, 533 S.E.2d 168, 189 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). However, defendant's argument relies exclusively on North Carolina law and our discussion is limited accordingly.

The right of confrontation, as guaranteed by Article I, Section 23 of the North Carolina Constitution "extends to all times during the trial when anything is said or done which materially affects defendant as to the charge against him." *State v. Chapman*, 342 N.C. 330, 337-38, 464 S.E.2d 661, 665 (1995), *cert. denied*, 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996). When a defendant is tried capitally, the right to be present is unwaivable. *Golphin*, 352 N.C. at 389, 533 S.E.2d at 189.

When a violation of this right is found on appeal, defendant will prevail unless the State can show that any such violation was harmless beyond a reasonable doubt. *State v. Huff*, 325 N.C. 1, 32, 381 S.E.2d 635, 652-53 (1989), *judgment vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). However, this burden does not shift to the State unless and until defendant demonstrates constitutional error on the record. *State v. Blakeney*, 352 N.C. 287, 305-06, 531 S.E.2d 799, 813-14 (2000) (finding that when the transcript of a dialogue with the court indicated that defense counsel was present during a proceeding in a capital case, defendant's argument.that the transcript's failure to specifically indicate whether he was present during the same proceeding constituted a Confrontation Clause violation was insufficient to show error; thus, the burden did not shift to the State), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001); *State v. Adams*, 335 N.C. 401, 408-10, 439 S.E.2d 760, 763-64 (1994) (finding error in the trial judge's *ex parte* communications with three jurors but that such error was harmless, and further finding that the capital defendant could not carry his "burden in the first instance" that there may have been other impermissible *ex parte* communications not reflected in the record because the record did not reveal the existence of any such communications), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998); *cf. State v. Smith*, 326 N.C. 792, 794, 392 S.E.2d 362, 363-64 (1990) (granting the capital defendant a new trial because the record revealed the existence of *ex parte* communications between three prospective jurors and the trial judge but, because the record was silent as to the contents of the communications, the Court could not determine whether the errors were harmless beyond a reasonable doubt).

We determine that defendant has not shown a violation of the North Carolina Confrontation Clause on the record. Although defendant speculates that the bailiff may have engaged in "direct communications with, or indirect observations of, one or more jurors," the transcript in no way indicates that any such communication between the bailiff and the jury members occurred, particularly as the trial judge did not instruct the bailiff to communicate with the jury. Because "[w]e will not assume error 'when none appears on the record,' " defendant's assignment of error is overruled. *Blakeney*, 352 N.C. at 304, 531 S.E.2d at 812 (quoting *State v. Williams*, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968)), *quoted in State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996)).

## INEFFECTIVE ASSISTANCE OF COUNSEL

**[15]** Next, defendant assigns error to statements made by his defense counsel during both the jury selection and guilt-innocence phases of trial. Defendant argues that counsel improperly conceded to jurors during *voir dire* that defendant is guilty of first-degree murder, thereby depriving him of his Sixth Amendment right to effective assistance of counsel. Defendant further argues that counsel failed to establish a sufficient record of his knowing and voluntary consent to this trial strategy during the guilt-innocence phase and that such concessions constitute ineffective assistance of counsel *per se* under this Court's decision in *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986).

The two-part test for ineffective assistance of counsel is the same under both the state and federal constitutions. *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). A defendant must first show that his defense counsel's performance was deficient and, second, that counsel's deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984). Deficient performance may be established by showing that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 156 L. Ed. 2d 471, 484 (2003) (quoting *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693). Generally, "to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534, 156 L. Ed. 2d at 493 (quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698).

In *Harbison*, defense counsel told the jury during closing argument that he did not "feel that [the defendant] should be found innocent. I think he should do some time to think about what he has done. I think you should find him guilty of manslaughter and not first degree." 315 N.C. at 178, 337 S.E.2d at 506. This Court held that when a defense counsel, "to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed." *Id.* at 180, 337 S.E.2d at 507. By admitting the defendant's guilt without his consent, counsel had "swept away" the defendant's right to plead "not guilty" and the defendant's "rights to a fair trial and to put the State to the burden of proof." *Id.* Accordingly, this Court concluded that a "per se . . . violation of the Sixth Amendment [] has been established in every criminal case in which

the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *Id.* at 180, 337 S.E.2d at 507-08. *See also State v. Matthews*, 358 N.C. 102, 591 S.E.2d 535 (2004). However, defendant has not shown a *Harbison* violation in this case.

With regard to jury selection: During *voir dire*, defense counsel asked several prospective jurors, "Do you feel that you're up to making a life or death decision?" On at least three occasions, defense counsel followed his question with one of these statements: "That's what you are going to be asked to do,"; "[W]e are here, and if you're selected on the jury, you would be called upon to make such a decision"; and "I'm asking in a real way, because that would be a decision that all four of you would be making in this case, in this courtroom, with respect to John Thompson." Defendant argues that defense counsel's statements could only be interpreted as admissions of defendant's guilt of capital murder because the statements implied that the trial would *necessarily* include a capital sentencing phase. As the jury *voir dire* was conducted in panels with the potential jury pool present in the courtroom, defendant contends that four jurors who were later seated also heard defense counsel's statements.

This Court has consistently considered a defense counsel's statements in context to determine whether they are concessions under *Harbison*. *See State v. Hinson*, 341 N.C. 66, 78, 459 S.E.2d 261, 268 (1995) (finding no ineffective assistance under *Harbison* in defense counsel's closing argument and emphasizing that "defendant [had] taken the challenged comments out of context"). After a careful review of the transcripts and briefs, we are satisfied here that defense counsel's statements during *voir dire* were not intended as concessions of defendant's guilt; rather, the statements were part of a broader series of questions through which defense counsel sought to ascertain whether prospective jurors were predisposed to automatically vote for either life in prison without parole or the death penalty. In particular, defense counsel repeatedly prefaced his questions with variations of the following inquiry:

> Mr. Causey: [D]o you feel that *if you were in the sentencing phase*, where you have sat on the jury, you've heard all the evidence, found John guilty of premeditated, deliberated murder, would you still be able to consider both life without parole and the death penalty as both [sic] possible punishment? Or would you lean towards one or the other?

(Emphasis added.) At another time defense counsel asked:

STATE v. THOMPSON

[359 N.C. 77 (2004)]

Do you likewise feel that *if we were in a sentencing hearing* and you've already found John guilty of first-degree, premeditated murder, that's no longer an issue, you've said he's done it, he thought about it, meant to do it, and did it, killed another person. Would you at that point of the trial be able to consider both life without parole as a possible punishment and the death penalty?

(Emphasis added.)

Further, the trial court informed potential jurors before *voir dire* that the attorneys "have the right to . . . ask you some questions about your positions on the death penalty, on capital punishment." Notwithstanding those questions, the trial court instructed the prospective jurors that the trial would not proceed to a capital sentencing phase unless the jury found defendant guilty of first-degree murder and "there would be no sentencing hearing convened, unless and until a person is found guilty of first-degree murder. So the fact that we are discussing a sentencing hearing presumes that there has been a verdict of first-degree murder returned." When viewed in context, defense counsel's statements during jury selection appear wholly distinct from the statements of the defense counsel in *Harbison* and do not constitute ineffective assistance of counsel *per se* under *Harbison*.

As for the guilt phase of trial, defendant argues that counsel essentially conceded guilt of felony murder by acknowledging that defendant had robbed Domino's and shot Bruhmuller. Defendant also contends that the trial court did not request sufficient details on the content of his defense counsel's anticipated trial strategy. Without such detail, defendant argues that the record fails to establish that he understood the gravity of counsel's concessions, specifically, that he understood defense counsel would concede his guilt on the capital charge of felony murder.[2] Because the record reflects that defendant

2. Although defendant also argues that "[n]either the short-form indictment nor any other aspect of this record established that defendant received notice of the 'true nature of the charge'—*i.e.*, the elements of capital murder on the theories presented by the prosecution—*before* his lawyers conceded guilt on that charge to the jury," we note that this Court has previously held that short-form indictments meet state and federal constitutional requirements and are sufficient to charge first-degree felony murder as well as first-degree murder carried out with malice, premeditation, and deliberation. *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003); *see also State v. Braxton*, 352 N.C. 158, 174-75, 531 S.E.2d 428, 437-38 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Moreover, our holding in *State v. Harbision*, is narrowly designed to safeguard defendant's rights to effective assistance of counsel and to plead "not guilty," and does not implicate the panoply of due process concerns briefed by this defendant.

STATE v. THOMPSON

[359 N.C. 77 (2004)]

knowingly and voluntarily consented to the trial strategy employed by his defense counsel, these assignments of error are overruled.

During the guilt-innocence phase and before closing arguments, the trial court inquired of defense counsel whether "there will be any portion of the argument which could be construed as an acknowledgment of culpability or an admission of guilt on the part of the defendant." Counsel responded, "Your Honor, the way that I plan on handling that is, by acknowledging responsibility in these cases, but without specifically mentioning guilt" and confirmed that he had discussed this strategy with defendant, after which the trial court questioned defendant directly.

The trial court asked defendant to stand and swore him under oath. Thereafter, the court entered the following colloquy on the record:

THE COURT: Mr. Thompson, at this time, I'm going to speak to you about the conversation I just had with Mr. Chamberlin, about the argument that he intends to make to the jury in your case. He has told me that he has in fact discussed the general nature and subject of his argument with you. Have you had that discussion with Mr. Chamberlin?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do you understand that in any criminal case, the decision as to what plea [is] to be entered must be made exclusively by the person who is charged, in this case, by you?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that you have to decide what plea to enter before the jury and before the Court? Related to that is a rule that the decision as to whether to admit guilt or culpability or fault to any kind of criminal offense, if that's going to be done by your lawyer during arguments to the jury, that has to be agreed to by the person accused, by the defendant, that is, by you. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And before an attorney can go before a jury and say that his client was guilty or possibly responsible for any criminal conduct, he has to have the accused person's, that's your, consent before he can do that. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Have you in fact—again, I'll ask you, have you discussed that particular trial strategy with your lawyer, particularly Mr. Chamberlin, about his final argument?

THE DEFENDANT: Yes, sir.

THE COURT: And do you in fact agree that Mr. Chamberlin may make that type of argument to the jury, admitting responsibility for some of these events?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do you have any questions you'd like to ask me about any of what we've just discussed here?

THE DEFENDANT: No, sir.

THE COURT: Okay. You are agreeing to Mr. Chamberlin making an argument to that general effect to the jury; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Thank you, Mr. Thompson. Would you be seated, please.

Defense counsel ultimately argued to the jury during the guilt-phase closing argument that although defendant had robbed the Domino's and shot Bruhmuller, he had not acted with premeditation and deliberation. For that reason, defense counsel urged the jury to find defendant not guilty of first-degree murder based upon the theory of malice, premeditation, and deliberation. Defense counsel did not otherwise address the State's theory of first-degree felony murder predicated upon robbery with a dangerous weapon.

Immediately following defense counsel's closing argument, the trial court inquired as to whether defendant was "able to clearly hear the speech that [defense counsel] just made to the jury." Defendant responded that he had heard the closing argument, after which the court asked, "Is that the type of speech or statement that you and [defense counsel] had discussed making to the jury?" and "Do you agree and consent to him making that speech to the jury?" Defendant responded, "Yes, sir" to both questions.

In *Harbison*, the defendant had not consented to his counsel's concession of guilt, and the trial court did not take steps to ascertain whether this strategy had been discussed with the defendant. This

Court has since stated that an on-the-record exchange between the trial court and the defendant is the preferred method of determining whether the defendant knowingly and voluntarily consented to an admission of guilt during closing argument. *State v. McDowell*, 329 N.C. 363, 386-87, 407 S.E.2d 200, 213 (1991). However, this Court has declined to define such a colloquy as the sole measurement of consent or to set forth strict criteria for an acceptable colloquy. *Id.* at 387, 407 S.E.2d. at 213.

It is sufficient to note that the exchange that took place here is nearly identical to the on-the-record discussion which we held to show knowing and voluntary consent in *McDowell*, 329 N.C. at 385-86, 407 S.E.2d at 212-13. Although the trial court in *McDowell* also provided the defendant with an unobtrusive means to signal during closing argument that defense counsel had exceeded his authority, *id.* at 386, 407 S.E.2d at 213, we do not view this practice as essential to a determination of defendant's knowing and voluntary consent to concessions made in the argument.

Here, the trial court twice confirmed that defense counsel had discussed the trial strategy with defendant. The court also twice informed defendant that he had the right to choose which plea to enter and that his counsel could not admit any degree of "guilt or culpability or fault" without his consent. Then, the court twice asked defendant whether he agreed that defense counsel had permission to "admit[] responsibility for some of these events" to the jury. Defendant stated that he agreed and that he had no questions about his discussion with the court. Following closing argument, the court inquired and defendant stated under oath that defense counsel had made the type of statement which he expected and that he agreed and consented to defense counsel's argument.

Accordingly, we find that defendant's on-the-record consent to his counsel's argument complied with the requirements of *Harbison*; therefore, we deny defendant's alternative request that this Court remand his case for an evidentiary hearing on whether defendant consented to defense counsel's concessions of guilt.

Because defendant voluntarily and knowingly consented to defense counsel's concessions, no *per se* violation occurred, and further review is "pursuant to the normal ineffectiveness standard set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 . . . (1984)[] and *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985)." *McDowell*, 329 N.C. at 387, 407 S.E.2d at 213. However,

defendant has entered only a general assignment of error on this point, and defendant's only arguments relate to his claim that defense counsel's statements violated the *per se* ineffective assistance of counsel standard established by *Harbison*. For this reason, defendant is deemed to have waived broader review under *Strickland* and *Braswell* as to whether defense counsel's alleged concessions constituted ineffective assistance of counsel. N.C. R. App. P. 28(a) ("Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief are deemed abandoned.").

[16] Next, defendant contends that the record on appeal contains several additional ineffective assistance of counsel issues. However, defendant presents no more than a general argument that these issues cannot be resolved without further development of the record or references to information outside of the record. Defendant asks this Court to rule that he cannot be procedurally barred from raising these claims during future litigation because he was unable to litigate them fully on direct appeal. He emphasizes that the cold record prevents review under the ineffective assistance of counsel standard established by *Strickland* and *Braswell* and what he characterizes as "the cumulative prejudice review" required by *Wiggins v. Smith*.

Defendant seeks to preserve the following claims:

Denial of defendant's Motion to compel investigators to provide all investigative materials to the prosecutor . . . ; counsel's apparent failures to request individual jury *voir dire*, to object to "death qualification" of the jury, to seek supplemental questioning of jurors who expressed concern about the death penalty and were challenged by the [S]tate for cause on that basis, and to exhaust peremptory strikes while seating, *inter alia*, one or more jurors whose family members were victims of violent crime . . . ; any acts or omissions, as noted throughout this [b]rief, that this Court might construe as trial waiver resulting in the decision against defendant of any aspect of any Issue raised on appeal; any possible bases for collateral attack on defendant's 1990 guilty plea and judgment, such as insufficiency of the evidence or the incompletely voluntary, intelligent, and knowing nature of the plea, whether or not related to possible prosecutorial overreaching on the elements of "kidnapping" that inhere in the act of robbery under *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978); and counsel's opening the door in the

sentencing phase to prejudicial information regarding defendant's disciplinary record in prison. . . .

In the alternative, defendant's appellate counsel moves this Court to stay the present appeal and order appointment of two post-conviction attorneys to pursue such claims in a motion for appropriate relief.[3] Apart from broad statements that the cold record does not permit review and references to transcript and record pages, defendant presents no support for his assertion that these issues cannot be litigated on direct review, nor does defendant indicate what additional types of evidence may be needed to resolve them.

Although defendant assigns error to the ineffective assistance of counsel claims listed above, he has expressly stated in brief and at oral argument that he is not requesting substantive review of any ineffective assistance of counsel claims; rather, defendant asks this Court to identify a list of potential ineffective assistance of counsel claims not subject to the procedural bar to motions for appropriate relief provided in N.C.G.S. § 15A-1419. For this reason, the Court will not analyze whether his ineffective assistance of counsel claims meet the standard established by *Strickland. See* N.C. R. App. P. 28(a) ("Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned.").

A motion for appropriate relief is denied when "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C.G.S. § 15A-1419(a)(3) (2003). Section 15A-1419 " 'is not a general rule that any claim not brought on direct appeal is forfeited on state collateral review. Instead, the rule requires North Carolina courts to determine whether the particular claim at issue could have been brought on direct review.' " *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 525 (2001) (quoting *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir. 2000), *cert. denied*, 531 U.S. 1089, 148 L. Ed. 2d 694 (2001)), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). It is well established that ineffective assistance of counsel claims "brought on direct review will be decided on the merits when the cold record reveals that no further

---

3. In a related argument, defendant likewise requests that this Court, *ex mero motu*, identify any ineffective assistance of counsel claims that should be litigated, allow his appellate counsel to withdraw based upon deficient performance, appoint replacement appellate and post-conviction counsel, and stay the proceedings. Given our discussion and disposition of this issue, we decline to grant defendant such relief.

investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *Id.* at 166, 557 S.E.2d at 524. Thus, when this Court reviews ineffective assistance of counsel claims on direct appeal and determines that they have been brought prematurely, we dismiss those claims without prejudice, allowing defendant to bring them pursuant to a subsequent motion for appropriate relief in the trial court. *Id.* at 167, 557 S.E.2d at 525.

> It is not the intention of this Court to deprive criminal defendants of their right to have [ineffective assistance of counsel] claims fully considered. Indeed, because of the nature of [ineffective assistance of counsel] claims, defendants likely will not be in a position to adequately develop many [ineffective assistance of counsel] claims on direct appeal. Nonetheless, to avoid procedural default under N.C.G.S. § 15A-1419(a)(3), defendants should necessarily raise those [ineffective assistance of counsel] claims on direct appeal that are apparent from the record.

*Id.*

Although the relief defendant seeks is not appropriate in the case *sub judice*, it is not entirely unprecedented, contrary to the State's argument. *See State v. Watts*, 357 N.C. 366, 378, 584 S.E.2d 740, 749 (2003), *cert. denied*, —— U.S. ——, 158 L. Ed. 2d 370 (2004) (holding no waiver of ineffective assistance of counsel claim by failure to raise it on direct appeal when the defendant's trial attorney failed to present any mitigating evidence at sentencing); *see also State v. Hyatt*, 355 N.C. 642, 668, 566 S.E.2d 61, 78 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003) (dismissing without prejudice an ineffective assistance of counsel claim alleging counsel's failure to procure certain records that could have been useful to impeach key witnesses at trial, while rejecting a second ineffective assistance claim on the record after finding that although that claim was capable of being developed and argued on direct appeal, defendant failed to state the claim with specificity or to present supporting arguments); *State v. Long*, 354 N.C. 534, 539-40, 557 S.E.2d 89, 93 (2001) (directing that the defendant not be precluded from raising ineffective assistance of counsel claim in future postconviction proceedings where the sole contention was the propriety of trial counsel's preparation and preservation of a defense to first-degree murder based upon intoxication).

In light of our holdings in *Watts, Long,* and *Hyatt,* we do not agree with the State that defendant is seeking an advisory opinion as to the application of the section 15A-1419(a)(3) procedural bar. However, given the sheer number and breadth of defendant's potential ineffective assistance of counsel claims, his failure to provide the Court with *any* argument as to why the record is insufficient to raise those claims at this time, and the fact that he refers to a cumulative ineffective assistance of counsel claim, we decline to determine whether his potential claims are subject to the procedural bar established by N.C.G.S. § 15A-1419(a)(3). We note that defendant's attempt to raise this issue on direct appeal in no way precludes him from raising his ineffective assistance of counsel claims during a future proceeding.

## PRESERVATION ISSUES

Preliminarily, we address an issue which defendant did not characterize as one submitted for preservation, but which our review indicates is most appropriately examined under this heading. Defendant argues that the trial court erred in failing to submit the nonstatutory mitigator that he had "a family and support system who will continue to provide support for him emotionally during his incarceration." As defendant acknowledges, this Court has previously addressed this issue, holding contrary to defendant's position. While "[a] capital defendant must be permitted to present any aspect of the defendant's character, record, or any other circumstance which a jury could deem to have mitigating value . . . . 'The feelings, actions, and conduct of third parties have no mitigating value as to defendant and, therefore, are irrelevant to a capital sentencing proceeding.'" *State v. Hardy,* 353 N.C. 122, 132-33, 540 S.E.2d 334, 343 (2000) (citations omitted) (quoting *State v. Locklear,* 349 N.C. 118, 161, 505 S.E.2d 277, 302 (1998), *cert. denied,* 526 U.S. 1075, 143 L. Ed. 2d 559 (1999)), *cert. denied,* 534 U.S. 840, 151 L. Ed. 2d 56 (2001); *see also Locklear,* 349 N.C. at 160-61, 505 S.E.2d at 302 (finding no error in trial court's excluding from jury charge a mitigator stating that "defendant continues to have family members, such as his mother, brother, aunts and uncles, who care for and support him"). Despite defendant's arguments to the contrary, we find no compelling reason to revisit our position on this issue in the context of the present case.

Defendant raises three additional issues he concedes have been previously decided by this Court contrary to his position, but

requests that we reconsider these issues in light of the circumstances surrounding the present case. Defendant further specifies that he raises these issues to preserve them for later review.

Defendant assigns error to the prosecutor's use of a short-form murder indictment, arguing that the indictment failed to allege all elements of first-degree murder and failed to allege aggravating circumstances. Therefore, according to defendant, his conviction and death sentence are not supported by the indictment and violate his due process rights as secured by the United States Constitution. As defendant concedes, this Court has previously addressed and rejected these arguments. In *Hunt*, this Court held that the use of a statutorily authorized short-form indictment "violates neither the North Carolina nor the United States Constitution." 357 N.C. at 278, 582 S.E.2d at 607. Defendant presents no compelling reason why the Court should reconsider this issue. Accordingly, this assignment of error is overruled.

Defendant also assigns error to the trial court's failure to determine whether defendant made a voluntary, knowing, and intelligent decision regarding his right to testify in the sentencing phase of his capital trial. Defendant notes that the trial court did inquire during the guilt-innocence phase whether he wished to testify, but made no such inquiry during the sentencing phase. As defendant concedes, this Court has previously addressed and rejected similar arguments in *State v. Smith*, 357 N.C. 604, 588 S.E.2d 453 (2003), *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (2004). In *Smith*, the trial court failed to inquire whether the defendant wished to testify at his sentencing hearing. This Court rejected defendant's argument that his rights were violated because at the end of the guilt-innocence phase of the trial, defendant personally and through counsel informed the court that he had decided not to testify; furthermore, defendant never made any request to testify during his sentencing proceeding. *Id.* at 618-19, 588 S.E.2d at 463. Because we find that our decision in *Smith* controls the disposition of this issue and we see no reason to revisit our holding in that case, we conclude that defendant is not entitled to relief as to this issue.

Finally, defendant contends that the trial court erred in sentencing him to death because the death penalty is cruel and unusual and the North Carolina capital sentencing scheme is unconstitutionally vague and overbroad. Defendant also contends that the death sentence was not supported by the evidence in this case and was

imposed under the influence of passion, prejudice, and other arbitrary factors in violation of his rights to due process, equal protection, and a capital sentencing hearing free from arbitrariness and caprice, as protected by state, federal, and international law. As to this issue, defendant presents the following arguments: (1) the nature of the capital sentencing jury instructions and the likelihood of systematic jury misunderstanding and misapplication of the law render his capital sentencing proceeding and death sentence fundamentally unfair and unreliable; (2) this Court's method of proportionality review does not satisfy the standards set forth in N.C.G.S. § 15A-2000(d)(2) and violates capital defendants' rights to due process, effective assistance of counsel, and freedom from cruel and unusual punishment; (3) that North Carolina's capital sentencing scheme is unconstitutionally infected with racial bias; and (4) the overbroad application of the "prior appeal" procedural bar contained in N.C.G.S. § 15A-1419(a)(3) renders our capital sentencing scheme unconstitutional.

Defendant argues that his death sentence must be vacated under the state and federal constitutions, as well as the International Covenant on Civil and Political Rights. Initially, we acknowledge that notions of international justice are not always consistent with the jurisprudence of our state and nation. We recognize that our foremost task is to uphold the Constitutions of the United States and the State of North Carolina. *Cf. Stanford v. Kentucky,* 492 U.S. 361, 369 n.1, 106 L. Ed. 2d 306, 318 n.1 (1989) ("We emphasize that it is *American* conceptions of decency that are dispositive . . . ."); *Thompson v. Oklahoma,* 487 U.S. 815, 868-69 n.4, 101 L. Ed. 2d 702, 741 n.4 (1988) (Scalia, J., dissenting) ("[T]he views of other nations, however enlightened . . . cannot be imposed upon Americans through the Constitution."). To that end, we exercise judicial restraint and decline to consider the general principles of international law raised by defendant. Further, we have previously considered defendant's constitutional arguments on these matters and decline to depart from our existing law.

## PROPORTIONALITY

[17] Having determined that defendant's trial and capital sentencing proceeding were free from prejudicial error, this Court must now determine: (1) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the

death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (2003).

Concerning the first two determinations listed above, defendant was convicted of the first-degree murder of Kenneth Bruhmuller based upon the theory of malice, premeditation, and deliberation and upon the felony murder rule. As aggravating circumstances, the prosecutor requested and the trial court submitted to the jury that defendant had previously been "convicted of a felony involving the use or threat of violence to the person": (1) with regard to an armed robbery of Billy Adams on 17 March 1990; (2) with regard to an armed robbery of April Dobbins on 8 April 1990; (3) with regard to the kidnapping of Benjamin Thomas Pittman on 17 March 1990; (4) with regard to the kidnapping of Vivian Hooker on 8 April 1990; (5) with regard to the kidnapping of Thomas Lenk on 8 April 1990; (6) with regard to the kidnapping of April Dobbins on 8 April 1990; and (7) with regard to the kidnapping of Carlita Greene on 8 April 1990. *See* N.C.G.S. § 15A-2000(e)(3). The prosecutor also submitted that the murder was "committed for pecuniary gain." *See* N.C.G.S. § 15A-2000(e)(6). The jury found all eight of these aggravating circumstances to exist.

The jury also found two statutory mitigating circumstances: (1) that the murder was committed while defendant "was under the influence of mental or emotional disturbance," N.C.G.S. § 15A-2000(f)(2), and (2) that defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired," N.C.G.S. § 15A-2000(f)(6). The statutory catch-all mitigating circumstance was also submitted to the jury, but the jury declined to find that it existed. *See* N.C.G.S. § 15A-2000(f)(9) ("Any other circumstance arising from the evidence which the jury deems to have mitigating value."). Of the 17 nonstatutory mitigating circumstances submitted, one or more jurors found that five existed and had mitigating value: (1) that defendant "accepted responsibility for his criminal conduct"; (2) that defendant "provided financial support for children who were not his own"; (3) that "defendant provided love and emotional support to children who were not his own"; (4) that defendant "has continued to provide guidance and emotional support to these children since his incarceration"; and (5) that defendant "was reared in an unstable environment."

After a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, we conclude that the jury's finding of the eight distinct aggravating circumstances submitted was

fully supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

As for our final determination, we must consider whether the imposition of the death penalty in defendant's case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2); *State v. Robinson*, 336 N.C. 78, 132-33, 443 S.E.2d 306, 334 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of the proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986).

In conducting a proportionality review, we first compare the present case with other cases in which this Court concluded that the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. This Court has determined the death sentence to be disproportionate on eight occasions. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

This case is not substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate. In *Benson*, the defendant shot the victim in both legs with a shotgun during the course of an armed robbery, while the victim, a store manager, was making a night deposit at a bank. 323 N.C. at 320-21, 372 S.E.2d at 518. The victim later died of cardiac arrest due to loss of blood from the wounds inflicted. *Id.* at 321, 372 S.E.2d at 518. The defendant in *Benson* pled guilty to first-degree murder; his conviction was based solely upon the theory of felony murder; only one aggravating

circumstance, that the murder was committed for pecuniary gain, was submitted to and found by the jury; and the jury found, *inter alia*, as a mitigating circumstance that defendant had no significant criminal history. *Id.* at 328-29, 372 S.E.2d at 522. In contrast, defendant in the present case was convicted based upon the theory of malice, premeditation and deliberation, *and* the felony murder rule. It is well established that " '[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime.' " *Carroll*, 356 N.C. at 554, 573 S.E.2d at 917 (quoting *Artis*, 325 N.C. at 341, 384 S.E.2d at 506); *accord State v. Leeper*, 356 N.C. 55, 66, 565 S.E.2d 1, 8, *cert. denied*, 537 U.S. 1076, 154 L. Ed. 2d 573 (2002); *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Moreover, this Court considers it significant when a defendant's conviction for first-degree murder is predicated upon both the theories of malice, premeditation and deliberation, and of felony murder. *Carroll*, 356 N.C. at 554-55, 573 S.E.2d at 917. It is further significant that the jury found eight aggravating circumstances against defendant, seven of which were based upon defendant's prior, similar violent crimes. *Cf. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (finding the death penalty disproportionate in a robbery-murder case where the jury found only one aggravating circumstance, that the murder was committed for pecuniary gain).

Furthermore, while we have found the death penalty to be disproportionate in two cases where the jury found multiple aggravating circumstances, *see Young*, 312 N.C. 669, 325 S.E.2d 181 (finding of disproportionality where the jury found the murder was committed for pecuniary gain and during the course of a robbery); *Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (same where the jury found the murder to be heinous, atrocious, and cruel and part of a course of conduct), this Court has never determined the death penalty to be disproportionate when the jury found that the defendant was previously convicted of a felony involving the use or threat of violence to the person, *State v. Peterson*, 350 N.C. 518, 538, 516 S.E.2d 131, 143 (1999), *cert. denied*, 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000); *see also Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (only post-*Peterson* case finding the death penalty disproportionate, but in that case, e(3) was not found as an aggravating circumstance). As this Court has previously stated, " '[t]he jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate.' " *State v. Brown*, 357 N.C. 382, 395, 584 S.E.2d 278, 286 (2003) (quoting *State v. Lyons*, 343 N.C. 1, 27, 468 S.E.2d 204, 217, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996)), *cert. denied*, ——

U.S. ——, 158 L. Ed. 2d 106 (2004). In the present case, the jury found not one, but *seven*, aggravating circumstances based upon N.C.G.S. § 15A-2000(e)(3). In light of the above analysis, defendant's case is clearly distinguishable from those in which we have held the death penalty to be disproportionate.

We also consider cases in which this Court has found the death penalty to be proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although in so doing we examine those cases that are "roughly similar" to the crime and defendant in the present case, "we are not bound to cite every case used for comparison." *Roache*, 358 N.C. at 328, 595 S.E.2d at 435.

Evidence presented during both the guilt-innocence and the sentencing phases of defendant's trial indicated that, during the armed robbery of his former place of employment, defendant shot the manager, Kenneth Bruhmuller, whom he knew, in the face at close range with a sawed-off shotgun. Defendant then manually reloaded the shotgun with a new shell, cocked the hammer, and pulled the trigger, causing a second lethal wound to Bruhmuller's head. In an apparent attempt to cover up his crimes, defendant set fire to the building. Defendant's criminal history reflects convictions for seven violent felonies committed during the course of two robberies factually similar to the robbery in the present murder case. The jury found seven aggravating circumstances based upon those felonies. As indicated above, such a finding is significant in our determination that the death penalty is proportionate here. *Peterson*, 350 N.C. at 538, 516 S.E.2d at 144. In fact, this Court has previously deemed the (e)(3) aggravating circumstance, "standing alone, to be sufficient to sustain a sentence of death." *State v. Squires*, 357 N.C. 529, 543, 591 S.E.2d 837, 846 (2003), *cert. denied,* —— U.S. ——, 159 L. Ed. 2d 252 (2004); *see also State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Based upon precedent and the pertinent facts of this case, we conclude that this case is more analogous to cases in which we have found the death penalty to be proportionate than to those in which we have found the death penalty to be disproportionate.

Ultimately, a determination of whether the death penalty is disproportionate " 'rest[s]' upon the "experienced judgments" of the members of this Court.' " *Roache*, 358 N.C. at 328, 595 S.E.2d at 435 (quoting *Green*, 336 N.C. at 198, 443 S.E.2d at 47 and *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 355, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177 (1983)). Considering the nature of the crime and

the defendant in the present case, we conclude that the sentence was neither excessive nor disproportionate.

Based on the foregoing and the entire record in this case, we hold that defendant received a fair trial and capital sentencing proceeding, free of reversible error. Accordingly, the judgment of the trial court must be and is left undisturbed.

NO ERROR.

Justice NEWBY did not participate in the consideration or decision of this case.