ELMORE, Judge.
Defendant Steven Earl Taylor appeals from judgments entered after a jury convicted him of eighty-five property-theft and related crimes arising from eighteen residential break-ins and larcenies, and after he pled guilty to attaining habitual felon status. He asserts the trial court erred by (1) joining eighty-six charges for trial because the number of charges was too many for the jury adequately to consider and thus violated his constitutional due process rights; (2) denying his mistrial motion because irrelevant, prejudicial evidence was published to the jury and thus violated his constitutional right to a fair trial by an impartial jury; or, alternatively, (3) he received ineffective assistance of counsel ("IAC") because his trial counsel failed to discover and redact the prejudicial evidence from the State's exhibit before it was published; and (4) admitting victim-impact testimony during the guilt phase of trial.
First, because defendant did not raise his constitutional joinder argument at trial, we dismiss this unpreserved issue. Second, because the record evidence of prejudice to defendant's case based on the challenged evidence is merely speculative, we conclude that defendant has failed to demonstrate the trial court abused its discretion in denying the mistrial motion. Third, because the record is inadequately developed to review defendant's IAC claim on direct appeal, we dismiss his IAC claim without prejudice to his right to reassert it in a subsequent motion for appropriate relief proceeding. Fourth, although victim-impact testimony is inadmissible during the guilt phase of trial, defendant has failed to show prejudice arising from this error. Accordingly, we hold that defendant received a fair trial, free of prejudicial error.
I. Background
Around 30 June 2014, a multi-jurisdictional police task force was assigned to investigate a series of similarly conducted residential break-ins and larcenies that occurred in Moore County. At one break-in, police recovered an abandoned backpack containing a water bottle, night vision goggles, a pry bar, a hole saw, a drill bat, a cordless drill, a pocket knife, and an empty duffel bag. After DNA testing of the water bottle matched defendant's DNA profile, the police task force targeted him.
On 12 August 2014, a detective observed defendant drive to a residential neighborhood with Mychael Gillis and Heather Lammonds, defendant's girlfriend, riding as passengers. The detective observed Gillis exit the vehicle at an intersection and speak with defendant through the front window. He observed defendant and Lammonds drive through the neighborhood three more times before Gillis returned as a passenger. Police stopped the vehicle and arrested all three occupants.
Police searching the vehicle found a crow bar, a black mask, and black gloves, as well as jewelry, a pistol in a gun case, a keepsake engraved with the name "Kenneth Baer," and Baer's driver's license-items Baer testified at trial were stolen from his house after it had been broken into the day defendant was arrested.
After his arrest and during his police interview, defendant denied having participated in any recent break-ins and larcenies but admitted to having committed residential break-ins and larcenies in the past, going back to around 2007 or 2008, and detailed to police his fastidious surveillance and residential burglary techniques. However, police searching defendant and Lammonds' residence after their arrests found, inter alia , flashlights, black gloves, face masks, camouflage clothes and ghillie suits, binoculars, three pry bars, two lock picks, bolt cutters, and walkie-talkies; a ripped open metal safe; and documents containing surveillance notes on multiple residences, many of which had been previously broken into, entered, and stolen from, as well as Google Maps printouts of several residences containing handwritten surveillance notes. Police also discovered a spare bedroom that "looked like a jewelry store set up for examining and processing jewelry, precious metals, diamonds and so forth[,]" equipped with jeweler's glasses, gold testing kits, diamond testing equipment, digital scales, and pliers.
Police searching defendant's cellphone discovered several incriminating texts he sent to Gillis discussing residential break-ins and larcenies. For instance, defendant texted Gillis: "[W]e have three separate neighborhoods scouted" and "[t]rust me, there's plenty of work out there." His texts described valuable items he stole, including from one residence "a lot of jewelry and a medium size safe" that he got "$13,500 out of," and encouraged Gillis to "see the neighborhood" because "[t]here are so many houses left over there[,]" and "[w]e only did two today." Defendant texted Gillis that he intended "to hit 15 to 20 houses" and would "leave entire neighborhoods untouched but [he] needed to know if [Gillis] was going to work." Defendant continued: "Today was awesome but it should be me and you sharing it instead of Brian. Just figure out what days you want to work and let me know" and requested that Gillis "[s]top making me outsource these houses to this nut[, Brian]."
From 11 August 2014 to 16 May 2016, defendant was indicted for over eighty property theft crimes arising from nineteen residential break-ins and larcenies. Before trial, the State moved to join these and other charges totaling 203 for trial. But at the trial court's suggestion, the State reduced that number to eighty-six: nineteen felony breaking-or-entering counts, nineteen felony larceny counts, nineteen felony possession-of-stolen-goods counts, fourteen conspiracy-to-break-and-enter counts, four possession-of-burglary-tools counts, four firearm-possession-by-a-felon counts, two safecracking counts, two identity-theft counts, two obtaining-property-by-false-pretenses counts, and one felony larceny-of-a-motor-vehicle count.
In response to the State's joinder motion, defendant objected to joining seven charges-three of the possession-of-a-firearm-by-a-felon charges, and the four related identity-theft and obtaining-property-by-false-pretenses charges-because those charges were unrelated to the remaining seventy-nine charges arising from the stolen property and other evidence recovered from the search of defendant's residence. The trial court overruled defendant's objection and joined the eighty-six charges for trial.
At trial, the State presented evidence that defendant orchestrated a series of similarly conducted break-ins and larcenies at eighteen residences within close proximity every few weeks from December 2013 to August 2014, and that uniquely identifiable property stolen from each break-in was recovered from defendant's residence. In particular, Lammonds testified that defendant led a residential burglary conspiracy, instructing her to drive him through neighborhoods so he could take surveillance notes on homes that he later ransacked or directed Gillis to do the same and then paid Gillis for his work.
Relevant to the issues presented on appeal, at trial the State published to the jury an indexed list of forty-two webpages recovered from a forensic examination of a thumb drive found in defendant's residence. Most of the webpage titles concerned constructing and using different types of improvised weapons, as well as crime scene investigation techniques. The State's expert read only the titles of the forty-two webpages for about three minutes. However, typewritten near the bottom of each webpage title listed contained about three lines of text describing the website's full HTM file pathway-that is, the location from which the HTM file was downloaded onto the thumb drive. Among other text in the middle of those full HTM pathways was the language "Ebook - White Resistance Manual_v2," indicating the HTM file was downloaded from a manual advocating white supremacy. About three minutes after this website index list was published to the jury, defense counsel first discovered the white resistance language and immediately objected. After the jury was excused and a bench conference held, the State changed its line of questioning that day.
Before trial the next day, defense counsel moved for a mistrial. He argued the webpage evidence suggesting defendant was a white supremacist deprived him of his constitutional right to a fair trial before an impartial jury, and that he provided defendant IAC by failing to ensure this racially charged language (among nearly 5,000 discovery documents the State furnished to the defense before trial) was redacted before the State's exhibit was published to the jury. After extensive argument and considering the extent to which the jury might have seen or been impacted by the briefly published evidence, the trial court denied the mistrial motion. The State later identified three of the forty-two webpages it deemed most relevant and redacted any racially charged language with defendant's approval before publishing only those webpages to the jury. Later, still during the guilt phase of trial, the State elicited without objection victim-impact testimony from occupants of each residential break-in and larceny.
Defendant presented no evidence. After the trial court dismissed one conspiracy-to-break-and-enter charge, the jury convicted defendant of the remaining eighty-five charges. Defendant later pled guilty to attaining habitual felon status. The trial court arrested judgment on the nineteen possession-of-stolen-goods convictions and consolidated the remaining convictions into four judgments, imposing four consecutive terms of 97 to 129 months in prison. Defendant appeals.
II. Analysis
On appeal, defendant asserts the trial court erred by (1) joining eighty-six charges for trial because the number of charges was too many for the jury to adequately consider, thereby depriving him of his constitutional due process rights; (2) denying his mistrial motion because prejudicial evidence irreparably impacted the jury's impartiality; or, alternatively, (3) defendant argues that he received IAC because his trial counsel failed to discover that evidence before it was published; and (4) failing to exclude victim-impact testimony elicited during the guilt phase of trial.
A. Joinder
Defendant first asserts the trial court erred by allowing the State's motion to join eighty-six charges for trial because that number of charges was too many for the jury adequately to consider, thereby violating his constitutional due process rights. The State argues this issue is unpreserved for our review. We agree.
During the pretrial hearing on the State's joinder motion, defense counsel neither objected to joining all eighty-six charges nor objected on constitutional due process grounds. Rather, he objected to joining three of the four firearm-possession-by-a-felon charges because "there was only one firearm recovered from that apartment" and to the two identify-theft and the two obtaining-property-by-false-pretenses charges because they were not in "a common stream or transaction" with the remaining charges. Indeed, after conferring with defendant, defense counsel "stipulate[d] to the joinder of the cases ... where property was recovered from [defendant's] [a]partment"-that is, the other seventy-nine charges-and clarified that "we agree with the batting order [of charges] with the exceptions of three of the possession of firearm by felon and the silver duct tape cases at the bottom of the list."
As reflected, defendant only objected to joining seven of the eighty-six charges under a lack-of-transactional-connection theory and stipulated to joining the remaining seventy-nine charges. Yet for the first time on appeal, defendant raises a constitutional due process argument grounded in a theory that the eighty-six charges joined for trial were too many for the jury to adequately consider. Because defendant never raised this argument before the trial court, he failed to preserve this issue for appellate review. See N.C. R. App. P. 10(a)(1).
Nonetheless, defendant asks us to invoke Appellate Rule 2 to address the merits of this unpreserved constitutional issue. See N.C. R. App. P. 2. After considering his argument, the record evidence, and the overwhelming evidence of defendant's guilt, we conclude defendant has failed to satisfy his heavy burden of demonstrating that his is the "rare case meriting suspension of our appellate rules ...." State v. Campbell , 369 N.C. 599, 603, 799 S.E.2d 600, 603 (2017). We therefore decline to exercise our discretion and invoke Rule 2 to address this issue.
Further, defendant is procedurally barred from raising this constitutional due process argument for the first time on appeal under waiver doctrines incurable by Rule 2. See State v. Gainey , 355 N.C. 73, 93, 558 S.E.2d 463, 477 (2002) ("Constitutional questions not raised and passed upon at trial will not be considered on appeal." (citation omitted) ); State v. Sharpe , 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) ("[W]here a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts ... [for] a better mount ...." (citation and internal quotation marks omitted) ); State v. Payne , 280 N.C. 170, 171, 185 S.E.2d 101, 102 (1971) (explaining that where a defendant "causes (or ... joins in causing) the court to commit error," it serves as a "legal bar to the defendant's right to raise the question" (citations omitted) ). Accordingly, we dismiss this unpreserved constitutional issue.
B. Mistrial
Defendant next asserts the trial court abused its discretion by denying his motion for mistrial. He argues prejudicial evidence published to the jury suggested he was a white supremacist, thereby violating his constitutional right to a fair trial by an impartial jury.
A trial court "must declare a mistrial ... if there occurs during the trial an error or legal defect in the proceedings, or conduct inside ... the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C. Gen. Stat. 15A-1061 (2015). "[W]hether substantial and irreparable prejudice has occurred lies within the sound discretion of the trial judge and ... his decision will not be disturbed on appeal absent a showing of abuse of discretion." State v. Thomas , 350 N.C. 315, 341, 514 S.E.2d 486, 502 (1999) (citation omitted). Our review is highly deferential because the trial judge is best suited to determine the seriousness of any challenged incident that transpired at trial, its impact on the jury, and the extent to which it may have prejudiced the defendant's case. See id. ("The decision of the trial judge is entitled to great deference since he is in a far better position than an appellate court to determine the effect of any such error on the jury." (citation omitted) ).
At trial, the State published to the jury an indexed list of forty-two webpages downloaded as HTM files to a thumb drive recovered from defendant's residence. Each listed webpage contained several lines of informational text, including in relevant part the full file pathway where the HTM file was downloaded onto the thumb drive. Among other text in the middle of those file pathways was the language "Ebook - White Resistance Manualv2_4," as demonstrated below:
?
For about three minutes, from 3:42:17 until 3:45:15 p.m., the State's computer-forensics expert, Robert Price, read aloud all forty-two webpage titles to the jury. Using webpage number seven above as an example, Price read "28 underscore evidence collection at crime scenes dot HTM" before reading the next webpage title. The webpage titles included, inter alia , "acquiring funds," "arson," "booby trap plus mines," "control of information," "explosives," "firearms," "improvised explosive devices," "leaderless resistance," "sabotage," and "selective assassination."
At 3:45:37 p.m., upon the State's request, Price clicked the link to open "28_EvidenceCollectionAtCrimeScenes," scrolled through that webpage, and read a few subheadings, including "[p]olice investigations[,]" "fingerprints[,]" "[t]race elements," and "[t]ool marks," before the State directed Price to read content under one subheading instructing how to thwart crime detection by wearing gloves and leaving as little evidence as possible at crime scenes. The State then handed Price an exhibit, a binder containing printouts of all forty-two webpages, and defense counsel immediately objected to its introduction under Rules 401 and 403, and asked to approach the bench.
At the bench conference, the State argued some webpages in the binder were admissible under Rule 404(b) to show "motive, opportunity, intent[,] and planning" because defendant followed its instruction and techniques in committing the multiple break-ins and larcenies. However, before the trial court ruled on the admissibility of the webpage printouts, the State offered to change its line of questioning for the day, conceded only three webpages were most relevant to its case, and provided copies of those printouts to the defense for redaction of any prejudicial language before its publication to the jury.
The next day before trial defense counsel moved for a mistrial. He argued the webpage evidence suggested defendant was a racist terrorist and thus irreparably prejudiced the jury, and he had provided IAC in failing to recognize that racially charged language before it was published. After extensive argument and consideration, the trial court denied the mistrial motion.
As an initial matter, the parties dispute what evidence the jury actually saw. The State asserts only the indexed list of webpages containing the "White Resistance Manual" language in the HTM file pathways was published to the jury. Defendant asserts Price briefly opened each webpage before the jury, some of which contained racist or terroristic language, such as: "Mines and booby traps also have great potential for causing general mayhem when employed in non-White areas."
Our review of the transcript reveals the State only asked Price to "read the titles of those [web]pages," not open them; Price read only the titles, not the HTM file pathways; and the State only asked Price to open the "28_EvidenceCollectionAtCrimeScenes" webpage, which contained no racist or terroristic language. Although the arguments during the two bench conferences indicate Price may have indeed briefly opened each webpage before reading the next webpage title, the record reveals that any inflammatory language from those webpages was well hidden among other text, and both the parties' and the trial court's remarks indicate that if any webpage had been opened, it was closed so quickly that someone unfamiliar with the webpage would have been unable to identify any particular language. Indeed, defense counsel later conceded the webpages "were only seen for a few seconds" and grounded his prejudice argument in the fact that the website index list containing the "White Resistance Manual" language was displayed for multiple minutes. Further, the trial court in ruling on the mistrial motion never indicated it considered any particular language from a webpage but only the website index list. Based on the record, we conclude that defendant failed to demonstrate the trial court abused its discretion in denying the mistrial motion.
The transcript reveals, after extensive argument, the trial court thoughtfully considered the seriousness of the incident and the impact, if any, it might have had on the jury in ruling on the mistrial motion. Among other factors, the trial judge acknowledged the evidence was published on "a big screen ... 40-some inches, 50-inches" situated "less than [15 feet] from the front row of the jury." He "recognize[d] that there [were] two African-American jurors" and "one retired military juror and one army veteran," but remarked he did not observe any particular jury reaction during or after the evidence was published. The judge explained "the quickness by which [Price] scrolled up and down kept [him] from being able to focus on particular aspects" of the evidence, and "it took [him] a while looking on [his] screen to see what [the parties'] were even referring to was down in the bottom ... of a paragraph of reference" in the full HTM file pathway. Indeed, the trial judge remarked he only noticed the "words 'white resistance' " during the bench conference on defendant's objection. Additionally, the trial judge reasoned, the "White Resistance Manual" language merely referred to the location from where the HTM file was downloaded, and thus any inference that defendant was a white supremacist because he downloaded those files from a white resistance manual was merely speculative. In light of these and other considerations, the trial judge ultimately concluded:
Putting all those things together, I do not find that this publication on the screen that was in front of the jury, particularly as it addresses ... that terminology and that bottom reference of white resistance is a substantial ... error in trial or legal defect in the proceedings or conduct inside the courtroom that results in a substantial and irreparable prejudice to the defendant's case, and the motion for mistrial on that basis is denied.
Subsequently, the State selected three webpage printouts it deemed most important, redacted any racially charged or terroristic language with defendant's approval, and published only those redacted webpages to the jury.
As reflected, the trial judge's denial of the mistrial motion was thoughtfully reasoned, and none of the matters at issue during trial involved race. Exactly what evidence was published to the jury is unclear, and prejudice is not readily apparent from the record. Cf. State v. Thompson , 359 N.C. 77, 86, 604 S.E.2d 850, 860 (2004) ("Prejudice is not readily apparent from the record before the Court; therefore, defendant's assignment of statutory error is overruled."). Our review of the record comports with the trial judge's clearer perception of the incident: that the challenged language was displayed quickly and well-hidden among other non-inflammatory text and, therefore, its brief publication was unlikely to have impacted the jury's impartiality. State v. Taylor , 362 N.C. 514, 537-38, 669 S.E.2d 239, 260 (2008) ("[T]he trial court is in a far better position than an appellate court to determine the effect of any [incident] on the jury." (citation and internal quotation mark omitted) ). Further, even had the record revealed more manifest prejudice, the independent evidence of guilt overwhelmed the impact of the error. Cf. State v. Morgan , 359 N.C. 131, 156, 604 S.E.2d 886, 901 (2004) (" '[T]he presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt.' " (quoting State v. Autry , 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988) ).
Given the speculative record evidence of prejudice and the strength of evidence against him, defendant has failed to demonstrate his case was irreparably prejudiced by the brief publication of this challenged evidence, and given the trial court's thoughtful consideration of the incident, defendant has failed to demonstrate its denial of the mistrial motion was "manifestly unsupported by reason." Taylor , 362 N.C. at 538, 669 S.E.2d at 260. Accordingly, we conclude the trial court did not abuse its discretion by denying the mistrial motion.
C. Ineffective Assistance of Counsel
Alternatively, defendant argues, he received IAC because his trial counsel failed to discover and redact any racially charged language before it was published to the jury. However, because the record is unclear as to, inter alia , what challenged evidence was actually published to the jury and to what extent it might have been published, the record before us is not adequately developed to review defendant's IAC claim on direct appeal. Accordingly, we dismiss defendant's IAC claim without prejudice to his right to reassert it in a subsequent motion for appropriate relief proceeding in the trial court. See, e.g. , State v. Fair , 354 N.C. 131, 166-67, 557 S.E.2d 500, 524-25 (2001) ("IAC claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing[;]" however, "should the reviewing court determine that IAC claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent MAR proceeding." (citations omitted) ).
D. Victim-Impact Testimony
Last, defendant asserts the trial court committed plain error by failing to exclude, without an objection, victim-impact testimony elicited from one or more occupants of each break-in and larceny during the guilt phase of trial. The State does not address the merits of the error asserted but contends defendant cannot establish plain-error prejudice based on the overwhelming evidence of his guilt. We agree.
Victim-impact testimony is inadmissible during the guilt phase of trial. See, e.g. , State v. Bowman , 188 N.C. App. 635, 645-46, 656 S.E.2d 638, 647 (2008) ("Because victim impact testimony has little, if any, probative value during the guilt phase of a trial, [it] is only admissible during the sentencing phase. The trial court erred in admitting victim impact testimony by victims of prior crimes[ ] ... during the guilt phase of the trial"). Accordingly, the victim-impact testimony elicited during the guilt phase of defendant's trial should have been excluded. But not every error requires a new trial. Because defendant failed to object to the victim-impact testimony at trial, we review its admission for plain error.
To establish plain error, a defendant bears the heavy burden of showing an error "had a probable impact on the jury's finding that the defendant was guilty." State v. Lawrence , 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation and quotation marks omitted). Defendant asserts "[t]he jury spent minimal time on deliberations" and argues "[p]art of the reason for the truncated deliberations might well have been the jury hearing witnesses recount their emotional trauma."
We find it unnecessary to recount the victims' impact testimony in light of the strength of evidence against defendant, which overwhelmed the impact of the error. The State presented overwhelming evidence of defendant's guilt, including evidence that each residential break-in and larceny was conducted similarly; defendant's DNA was found on a water bottle along with burglary tools in a backpack abandoned at one break-in; uniquely identifiable stolen property from each break-in was found in defendant's residence, as were detailed surveillance notes on the residences; defendant sent numerous incriminating texts to Gillis concerning prior and future break-ins and larcenies; defendant admitted during his post-arrest police interview that he had a history of committing residential break-ins and larcenies, and detailed his techniques; and Lammonds testified that defendant led a residential break-in and larceny conspiracy. Based on the overwhelming evidence of defendant's guilt of the crimes charged, defendant cannot satisfy his heavy burden under plain-error review to establish that the victim-impact testimony probably impacted the jury's verdict.
III. Conclusion
Because defendant failed to preserve his constitutional due process joinder argument for appellate review, we dismiss this issue. Based on the speculative record evidence of prejudice arising from the challenged evidence published to the jury, defendant has failed to demonstrate the trial court abused its discretion in denying his mistrial motion. Because the record is inadequately developed to address defendant's IAC claim on direct appeal, we dismiss his IAC claim without prejudice to his right to reassert it in a subsequent motion for appropriate relief proceeding. Finally, although victim-impact evidence should not have been elicited during the guilt phase of defendant's trial, based on the overwhelming evidence of his guilt, defendant has failed to demonstrate plain-error prejudice arising from this error. Accordingly, we hold that defendant received a fair trial, free of prejudicial error.
NO PREJUDICIAL ERROR.
Report per Rule 30(e).
Judges HUNTER, JR. and DIETZ concur.